# CHARLESTON

## STATE *v.* CREMEANS.

Submitted January 29, 1907.   Decided April 23, 1907.

1. HOMICIDE—*Evidence—Sufficiency.*
   Where two persons are jointly indicted for murder and one is being separately tried and both had the same opportunity to commit the offense, if upon the whole evidence there remains a reasonable doubt as to which of the two committed the act, the defendant cannot be convicted unless it appears that if the other person did the killing the prisoner aided and abetted in the commission of the act.   (p. 139.)

2. SAME—*Admissibility—Threats of Third Person.*
   Upon the trial of a person for murder threats of another person against the deceased are admissible if such threats are accompanied by proof tending to show the guilt of such other person or connecting him with the crime.   (p. 142.)

3. SAME—*Character of Defendant.*
   On a trial for murder it is competent for the defendant to introduce evidence showing his general character and reputation for being peaceable and law-abiding, and negative evidence of character is competent—as where a witness swears that he has been acquainted with the defendant a long time and has been well acquainted in the community where he lives, his statement that he has never heard defendant's character for peaceableness discussed or questioned is admissible.   (p. 144.)

4. CRIMINAL LAW—*Writ of Error—Prejudicial Rulings—Exclusion of Evidence.*

When a party offers evidence which he is entitled to introduce to maintain the issue on his part and it is excluded it will be presumed that he was prejudiced thereby and will work a reversal of the judgment, unless it clearly appears from the whole record that such evidence if it had been admitted could not have changed the result. (p. 147.)

5. WITNESSES—*Determination as to Competency.*

When a witness is offered to testify in a case and objection is made thereto and the objector offers to show that the witness had been confined in an asylum for the insane and also put in jail on a charge of lunacy and had not been discharged from his lunacy, he should not be permitted to testify until the court has made a careful examination as to the facts, as well as to the condition of the mind of the witness at the time and found that he is competent. (p. 148.)

Error to Circuit Court, Mason County.

Grover Cremeans was convicted of murder in the second degree, and brings error.

*Reversed.  Remanded.*

W. R. GUNN, H. R. HOWARD, SOMERVILLE & SOMERVILLE, and VINSON & THOMPSON, for plaintiff in error.

CLARKE W. MAY, Attorney-General, for the State.

McWHORTER, JUDGE:

Grover Cremeans and William Taylor were indicted jointly in the circuit court of Mason county for the murder of John Smith on the —— day of June, 1904. Cremeans was tried separately on the plea of not guilty. The trial proceeded from day to day until the 18th day of March, 1905, when the jury returned a verdict that the defendant Grover Cremeans was not guilty of murder in the first degree but was guilty of murder in the second degree as charged in the indictment. The defendant by his counsel moved the court to set aside the verdict as being contrary to the law and the evidence and to grant him a new trial. The court took time to a future day of the term to consider said motion and on the 29th day of March the court overruled the motion and entered judgment on said verdict fixing the term of confinement in the penitentiary of the said defendant at sixteen years. In the course of the

trial the defendant tendered thirty bills of exceptions to various rulings of the court and in his petition for a writ of error assigned eight causes of error. The first three assignments are merely technical, involving bills of exceptions Nos. 1 and 2 and are not relied upon, indeed, are abandoned by the defendant, not in any way being mentioned in the brief of his counsel.

The fourth assignment of error is in giving each of the six instructions on behalf of the state over the objections of the defendant, as set out in bill of exceptions No. 3. The first instruction is as follows: "The court instructs the jury in this case that, if they believe from the evidence beyond a reasonable doubt that the defendant, Grover Cremeans, is principal either in the first or second degree, he is liable to punishment as if he were principal in the first degree.

"And the court further instructs the jury that an accessory before the fact is one who is absent when the act was committed, but who procured, counseled, commanded or abetted the principal or actual doer of the act to commit it." The last clause of this instruction is especially objected to. The defendant on trial and William Taylor were jointly indicted as principals for murder, neither of them as an accessory. In *State* v. *Roberts*, 50 W. Va. 422, it is held: "An accessory before the fact to a felony cannot be convicted on an indictment against him as principal." It is there further held: "Such accessory may be indicted with the principal or separately, but in either case he must be indicted as accessory and not as principal," And in *State* v. *Lilly*, 47 W. Va. 496, it is held: "Under the laws of this state, to convict a person as an accessory to a crime, he must be indicted and tried as such." It is only by implication from this instruction that the jury could consider the matter of an accessory and this is cured by the instruction hereinafter mentioned as given by the court on its own motion where the jury are instructed as the defendant was not indicted as an accessory he could not be convicted as such. The first part of the instruction correctly states the law. As to the remaining instructions given on behalf of the state, they seem to be unobjectionable and nothing is urged against them. In the second instruction, however, the word "personal" is used in

qualifying "doubt" when the word "reasonable" was evidently intended.

The instruction given by the court on its own motion set out in bill of exceptions No. 5 is as follows: "The jury is instructed that an accessory before the fact is one who is absent at the time of the actual perpetration of the crime, but procures, counsels, commands, incites or abets another to commit the crime. The crime of an accessory before the fact is a particular one. The absence of the accessory before the fact at the time and place of the principal offense is an essential element of the crime and absence at the time the crime was committed is necessary to make him an accessory before the fact; and in this case Grover Cremeans not being indicted as an accessory before the fact; therefore if you do not believe from the evidence in the case beyond a reasonable doubt that he killed John Smith as alleged in the indictment or that he was present when the said John Smith was killed, aiding and abetting in the killing of said John Smith as alleged in the indictment, he cannot be convicted, but in order to constitute presence at the time and place of killing said John Smith, it is not necessary that it would be shown by the evidence in the case that Grover Cremeans was immediately standing by when the said Smith was killed, within sight or hearing, it is enough if the jury believe from the evidence in the case that said Grover Cremeans kept watch or guard at a convenient distance while Smith was being killed by the principal actor. A principal in the second degree is one who is present aiding and abetting the principal actor in the commission of the crime and actual physical presence is not necessary, a constructive presence is sufficient as in the instance of a person keeping watch or guard at a convenient distance while the murder is being committed by the principal actor." It is insisted that there was no evidence tending to show that both parties indicted were implicated in the crime; that the indications were that but one was immediately present at the commission of the crime, but it is shown that they went out together with their guns in the forenoon some three or three and a half hours before the killing and were seen together almost immediately after the murder. Under the evidence and

circumstances of the case the instruction given by the court was proper.

Defendant's instruction No. 9 refused by the court is as follows: "The jury are hereby instructed that if they believe from the evidence, beyond a reasonable doubt that John Smith came to his death as charged in the indictment, at the hands of either Grover Cremeans or William Taylor, and if they further believe from the evidence that both were not present at the time of the killing of John Smith as charged in the indictment, and if the jury have a reasonable doubt from all the evidence in the case as to which of the said parties took the life of said Smith as charged in the said indictment, then the jury must find the defendant Grover Cremeans not guilty." There was evidence tending to show that the killing was done by Taylor and no evidence to show that more than one of the two was immediately present or committed the offense. In 21 Cyc. 903, it is said: "Where the evidence against defendant is circumstantial, testimony tending to show that the homicide was committed by some other person is always admissible, although it may be insufficient to establish his guilt; the purpose of such testimony being, not to prove the guilt of the other person, but to generate a reasonable doubt of the guilt of the defendant." In *State* v. *Kerns*, 47 W. Va. 266, the trial court refused the following instruction: "The court instructs the jury that if, after considering all the evidence and circumstances, they have a reasonable doubt as to whether the defendant Kerns shot and killed the deceased, or whether she shot and killed herself, then they must give the defendant the benefit of such doubt, and acquit him." The refusal to give this instruction was held to be error. In that case the question was whether the defendant had shot the deceased or whether she had committed suicide; in this case it is whether Cremeans killed Smith or whether Taylor killed him, however, the question of an accomplice or abettor arises here which distinguishes this case from that. If the evidence tending to prove the killing by Taylor alone (and there was evidence of that character) was sufficient to raise in the minds of the jury a reasonable doubt as to which did the killing, it being shown that the killing was done by one or the other and not sufficient evidence to satisfy the jury that either aided and abetted

the other, then the defendant was entitled to his instruction No. 9. In Hughes on Instructions to Juries, section 728, that "When two persons had the same opportuniiy to commit the offense charged, and if, upon the whole evidence, there remains a reasonable doubt as to which of the two committed it, then neither of them can be convicted," is laid down as a good instruction. Citing *Vaughn* v. *Com.*, 85 Va. 671. See also *Campbell* v. *People*, 16 Ill. 17, 19, where it is said: "If it is uncertain from the evidence, in the minds of the jury, which one, out of two or more persons inflicted the stab, that would operate to acquit the prisoner, unless there is proof that the prisoner aided or abetted the person ascertained to have killed him." We conclude that defendant's instruction No. 9 should have been given.

Instruction No. 4 offered by the defendant is in the words following: "The jury are hereby instructed that if they believe from the evidence in this case that William Taylor took the life of John Smith as charged in the indictment, and that Grover Cremeans did not procure or advise the said William Taylor to take the life of the said Smith and was not present at the time of the killing of said Smith, and did not aid or abet therein; and if the jury further believe that said Cremeans, after killing of the said Smith, learned from and was informed by the said Taylor that he, the said Taylor, took the life of the said Smith, and the said Cremeans having so learned the fact of such killing suppressed and concealed such fact or aided or abetted the said Taylor in the suppression or concealment of the fact of the killing of the said Smith, then the jury should find the said Cremeans not guilty as charged in the said indictment." From this instruction the court struck out the words "and was not present at the time of the killing of said Smith" and as so amended it was given by the court. The striking out of these words was error as the being present was one of the elements which it was necessary for the state to prove to constitute the defendant a principal in the crime. If he had been indicted as an accessory before the fact it would have been proper to strike it out.

It is contended that instructions Nos. 1, 2, 3 and 5 were good and should have been given. No. 3 like No. 4 is based upon defendant's theory of the case that the killing was

done by another without defendant's presence and aid and that the fact of the killing came to his knowledge after the act, that the defendant's suppression and concealment of the fact would make him an accessory after the fact and that therefore he could not be convicted on this indictment. No. 4 as offered by defendant was in effect the same as No. 3 and should have been given. Instructions Nos. 1, 2 and 5 should have been given as they properly present under the evidence the defendant's theory of the case.

Defendant's instruction No. 10 was properly refused as misleading to the jury in that they are instructed, that in order to aid and abet another in the commission of the crime the person aiding and abetting must not only be present but must then and there do some act to render aid to that other. In the abstract this would be good, but under the evidence in this case it is not applicable. If it be true that the defendant Cremeans commanded, advised or procured another to do the killing and was also present at the commission of the crime then his presence alone was sufficient to convict without then and there doing some act to aid in the crime.

Bill of exceptions No. 6 certifies all the evidence taken in the case. All the other bills of exceptions from No. 7 to No. 30 inclusive relate to the exclusion of testimony claimed by the defendant to be competent and should have been admitted, and to the admission of testimony on the part of the state which was claimed by the defendant to be illegal. Bills of exceptions Nos. 7, 8, 16, 21, 22 and 25 are grouped together by counsel for defendant in their brief as relating to the same character of evidence to which it is claimed the same rule applies. This evidence all relates to the defendant William Taylor, indicted with the defendant here, part of which relates to his general bad character, part to his general statements that he would take life for a trivial sum, some to his general threats to take life, others to his threats to take the life of John Smith the deceased and one to his attempt to buy a rifle gun just prior to the killing. As set out in bill of exceptions No. 7 on cross-examination William Taylor, witness for the state, was asked if he remembered Burgess Cremeans coming to him in

the jail and talking to him, which he answered in the affirmative and was then asked: "In that conversation when he was talking to you at that time, that was the fall before John Smith was killed, and while you were in jail there, didn't you say, 'I would just as soon be one place as another; anywhere my hat is off I am at home,' and that you didn't care whether you were in jail or not?" Which question the witness was not permitted to answer. He was further asked: "Haven't you been in jail at Huntington? A. I have been, yes, sir." To which question and answer the state objected and the same were not permitted to go to the jury. And as set forth in bill of exceptions No. 8 the witness was asked: "In the presence of Babe Holly, about a month before Smith was killed, down near Albert Cremeans' store, or the old store house, didn't you say you expected to be in the penitentiary before a year?" Which question on the objection of the state was not permitted to be answered. The defendant was not entitled to these answers as tending to degrade the witness William Taylor either in case the witness declined to answer or the court in its discretion refused to allow it to be answered, and unless the question and answer be relevant to the issue will not be grounds for exception. *State* v. *Hill*, 52 W. Va. 296; *State* v. *Prater*, *Id.* 132.

Bill of exceptions No. 16 relates to a question asked of Levi Holly, a witness on behalf of the defendant, who stated that he had known Taylor for several years—didn't know just how many—and was then asked: "Did you hear him say on one occasion in a game of poker when he had got busted that be wouldn't always be busted, that he would kill John Smith and have money to play poker with. That was said about a month before the killing?" Which question being objected to by the state was not permitted to be answered, but this could not have prejudiced the defendant for the same question in substance was immediately repeated to the witness and he was permitted to answer without objection as follows: "I heard him say, the boys was playing poker, he played some and got broke, sitting there he says, 'I will not always be hard up, I will kill old John Smith and take his money.'"

Bill of exceptions No. 21 is based upon the ruling of the court in excluding the following evidence of Harvey Kins-

ler: "At that time when you and he were both out of
money, and were talking together about it, did he say to you
that sometimes he got so he he could. kill a man for $100?
A. Yes sir. Q. When Taylor said to you what you have
stated, what if anything, did you say to him in reply? A.
I told him I wouldn't do that for any money. Q. What
did he then do or say? A. He just kind of laughed, and
shook his foot, and went on carrying." Bill of exceptions
No. 25 relates to evidence of Burgess Cremeans a witness for
the defendant which was excluded from the jury over the
objection of the defendant. The witness testified as follows:
"At South Columbus, the fall before John Smith was killed
did you hear William Taylor say that he would kill a man in
a minute? A. I did. Q. And what did you say in reply? Q.
Did he further say in answer to the reply of yours that you
didn't know what he would do? A. He did. (By the
Court.) Q. Kill 'a' man I believe you said. A. Yes sir."
There were no threats contained in the testimony as given
by either Kinsler or Burgess Cremeans as stated in these two
bills of exceptions against John Smith, but they seem to be
mere idle conversations which occurred at Columbus a long
time before Smith was killed. In 21 Cyc. 905, it is said:
"Threats of other persons against the deceased are hearsay
and as a rule are not admissible in evidence on behalf of one
charged with criminal homicide. But where the evidence
of threats is accompanied by proof tending to show the
guilt of the other person, or connecting him with the crime,
or where the evidence against defendant is wholly circum-
stantial, the threats of another person against the deceased
become competent evidence on behalf of defendant." And
cases there cited. *Vaughan* v. *Com.*, cited; *Crookham* v.
*State*, 5 W. Va. 510.

Bill of exceptions No. 22 goes to the testimony of Joe
Chandler on behalf of the defendant Cremeans ruling out
the evidence-of the witness where he answers in the affirma-
tive a question propounded to him, whether in May before
the killing of John Smith William Taylor wanted to buy
from him his rifle and offered him $5 for the gun. This matter
of attempting to purchase a gun very shortly before the kill-
ing was a circumstance tending to show a preparation on
the part of Taylor for the work which was afterwards done,

which Taylor was shown to have threatened to do; and it was shown that on the forenoon of the day of the killing the boys went out together, Taylor carrying a rifle when they went out and had the rifle when he came back in the afternoon. The defendant was entitled to have the benefit of this circumstance as throwing suspicion on Taylor and creating a doubt as to the guilt of himself.

Bill of exceptions No. 9 goes to the testimony of William Taylor on re-examination when this question was propounded: "You said something in reply to one of Mr. Hogg's questions that you left your gun out about a quarter of a mile from the store, in the grove. Why did you do that? A. We was out hunting, I had shot the last load out of the gun and it was not any use to carry the gun, so I left it on the hill." The defendant having elicited from the witness on cross-examination the fact that he had left his gun in the grove, the state had a right to his explanation for so leaving it to remove any impression that might have been left upon the minds of the jury that he had left it there for an improper purpose.

Bill of exception No. 10 goes to the evidence of Dr. J. H. Rowsy in relation to the general reputation as a law-abiding citizen of the defendant Cremeans. When asked what that reputation was as a law-abiding citizen prior to the day of the killing of Smith, he answered: "Pretty hard for me to say what the neighbors say of it." He was then asked, "Prior to the time of the killing of John Smith, did you at any time ever hear anything against the reputation and character of Grover Cremeans in the neighborhood in which you lived and he lives for being a peaceable and law abiding citizen?" The Court said, "Unless he can first say that he knows his reputation in the neighborhood where he lives he need not answer." He then testified as follows: "Q. As I understand, you live in the neighborhood, or near where Mrs. Cremeans lives, the mother of Grover Cremeans? A. Yes, sir. Q. And practice medicine in that neighborhood? A. Yes, sir. Q. And you travel in that community a great deal in your practice? A. Yes, sir. Q. How long have you practiced medicine there? A. Be eleven years next month. Q. And you lived there prior to that time? A. Was born and raised there. Q. During all the time

you have known Grover Cremeans from his boyhood up to
the present time, prior to the killing of John Smith, did you
ever hear his character discussed in the neighborhood and
among the neighbors as to his being a peaceable law-abiding
citizen?" To the answering of which questions and each of
them the state by counsel objected which objections were sus-
tained. While this witness answered that it was pretty hard
for him to say what the neighbors said of Cremeans' char-
acter as a peaceable citizen, yet his testimony clearly shows
that he was well acquainted with Cremeans practically all
his life as well as with his standing in the neighborhood
in which he lived and was necessarily qualified to know his
general reputation, and he knew more from not having
heard it discussed than from what he had heard—a very im-
portant character of knowledge, in fact the very best—and
not having heard that reputation discussed was doubtless
why he hesitated to say what other people said or thought
of him. In *Lemon* v. *State*, 4 W. Va. 755, (Syl. pt. 3),
the Court holds: "When the character of a witness for
truth and veracity has been impeached, the evidence of a
witness who has been acquainted for a long time with the
impeached, and has never heard the character of said wit-
ness for truth and veracity questioned, is admissible, al-
though said witness may never have heard any person or
persons say anything whatever concerning said impeached
witness' character." JUDGE BERKSHIRE who prepared the
opinion in the case at page 760 says: "The question,
therefore, is presented, whether a person who may be well
acquainted with a witness in the community in which he
lives, (whose character for truth and veracity has been im-
peached,) and has never heard the character of such witness,
in this respect, called in question or spoken of, is neverthe-
less a competent witness to sustain the witness and rebut
the evidence of bad character which may have been intro-
duced against such witness? This is a question of much
practical importance, and on this account, it is deemed
proper that it should be settled by the judgment of this
Court." And cites *Bucklin* v. *State*, 20 Ohio 18, and in
approving the same says: "The rule established in this
case, it seems to me, is founded in manifest good sense and
justice, and it would seem difficult to assign any sufficient

reason why it should not be applied to the case under consideration. Here the witness for the prisoner had been impeached, or attempted to be impeached, by the State, for the want of truth and veracity, and, in my apprehension, no more direct, appropriate, and effective evidence to rebut the charge of bad character could be produced, than the testimony of persons who, though for many years, were well acquainted with such witness in the neighborhood where she resided, had never heard her character, in this regard, called in question, or spoken of in the community. If the contrary doctrine contended for were to be adopted, it appears to me it must lead to this strange anomoly, that persons of the very highest honor and integrity would find it very difficult, if not impossible, to sustain their general reputation for truth and veracity among their neighbors, (should it chance to be ever called in question,) from the very fact that they have lived so far beyond the breath of suspicion, that no occasion had ever arisen to call in question their characters for truth and veracity, or cause them even to be spoken of in the community; and the absurdity of the rule becomes more apparent when it is remembered, that the more unsullied and exalted the character, the less likely it is ever to be called in question, or spoken of with respect to truthfulness, and consequeutly more difficult to sustain than characters of far less worth, because the latter had been the subject of conversation and speculation in the community, while the former had not. Thus it is seen that the rule insisted on, would require that before a person would be able to fortify and sustain his reputation for truth, should it ever be drawn in question, he must first show that it had been called in question or talked about among his neighbors, and that a witness who had never heard it questioned or spoken of, however well acquainted he may be with such person and the community in which he lives, is, for this reason, incompetent to prove or sustain the good character of such person or to rebut the evidence of bad chatacter, that may have been introduced against him; a principle that involves such absurd results, it seems to me, cannot be well founded, and I feel constrained, therefore, to reject it. On the contrary, it appears to me, that a person who should prove, by those in his community by whom he

is well known, that his reputation for truth and veracity, has never, so far as he knows, been called in question or talked about among his neighbors, might well claim, in the absence of evidence to the contrary, to have shown, at least a *prima facie* case of good character in this respect, and to have produced the most direct and satisfactory evidence, to rebut evidence of bad character, in case any may have been produced against him." And in *State* v. *Lee*, 22 Minn. 407, it is held: "Negative evidence of character is competent; for instance, the testimony of a witness who swears that he has been acquainted with an accused person for a considerable time, under such circumstances that he would be more or less likely to have heard what was said about him, and has never heard any remark about his character— the fact that a person's character is not talked about at all being excellent evidence that he gives no occasion for censure, or, in other words, that his character is good." Bills of exceptions Nos. 17, 23, 24, 26, 27 and 28 all come within this rule. Parties who had known the defendant—most of them all his life—had never heard his character discussed. They were in a situation to know and did know his general reputation as a peaceable and quiet citizen, and none of them had ever heard anything to the contrary and the evidence they gave should have been admitted; and under the circumstances of the case the evidence was very important to the defendant as the evidence against him was all circumstantial and he was seeking to prove that the crime was, or might have been, committed by another or connecting another with it and making it questionable as to his own guilt and if he could establish a good character as a peaceable boy in the neighborhood where he lived he was certainly entitled to do so. In *Taylor* v. *Railroad Co.*, 33 W. Va. 41, it is held: "Where illegal evidence is admitted, against the objection of a party, it will be presumed that it prejudiced such party, and if it may have prejudiced him, though it be doubtful whether it did or not, it will be cause for reversal of the judgment, but if it clearly appears that it could not have changed the result,—that, if it had been excluded, the same result would have followed—it will not be cause for reversing the judgment." *Webb* v. *Packet Co.*, 43 W. Va. 800; *Ins. Co.* v. *Trear*, 29 Grat. 259. It follows that the con-

verse of the proposition as to the admission of illegal evidence is equally true of the exclusion of legal evidence over the objection of the party offering it. When a party offers evidence which he is entitled to introduce to sustain the issue on his part and it is excluded, the presumption is that he is prejudiced by the exclusion thereof and will work a reversal of the judgment unless it clearly appears from the whole record that the admission of such evidence could not have changed the result. In *Crookham* v. *State*, cited, at page 514 JUDGE MAXWELL in speaking of an item of evidence which had been improperly admitted said: "It is not easy to see any effect the evidence could have had on the jury, but as it may have had some influence the judgment will have to be reversed. So in case at bar; the defendant being entitled to have the evidence of his good character as a peaceable law-abiding citizen before the jury it was reversible error to exclude it.

Bill of exceptions No. 11 relates to the testimony of William Miller when on cross-examination he was asked by the court in regard to the bicycle shoes which were introduced in evidence: "What time Sunday did you see Cremeans with those shoes on? A. About 9 o'clock. Q. Where was he at that time? A. At Squire Ball's. The counsel for the defendant moved to exclude the answer to the question propounded by the court as to what shoes the defendant had on after the homicide. There had been evidence tending to show tracks about where the killing was done which corresponded to the shoes in question and the state was entitled to the evidence.

Bill of exceptions No. 12 goes to the objection by the defendant to the introduction as a witness of Frank Lunsford by reason of his having been confined in the asylum for the insane and was also put in jail on the charge of lunacy, and asked the privilege of showing this fact before he should be examined, and to show also that he had never been discharged from his lunacy, which motion was overruled. In 30 A. & E. E. L. 935: "If the witness has been once found insane, this has the effect of casting upon the party offering him the burden of showing him to possess the necessary qualifications." *Railway Co.* v. *Thompson*, 82 Fed. Rep. 720; *Armstrong* v. *Timmons*, 3 Harr. (Del.) 342. In

*Hoyt* v. *Adee*, 3 Lansing (N. Y.) 173, it is held: "An in-
quisition of lunacy found against a witness is *prima facie*
evidence of his incompetency to testify. And this is so al-
though his testimony is offered against one who was not a
party to the proceedings in lunacy." *Coleman* v. *Com.*, 25
Grat. 865. The question of the competency of the witness
having been raised the court should have determined that
question upon a careful examination into the facts and
the condition of the mind of the witness. The question of
his competency is for the court and not for the jury.
*State* v. *Michael*, 37 W. Va. 565. The exception was well
taken.

Bill of exceptions No. 13 relates to the evidence of E. P.
Meadows who was the constable who made the arrest of the
defendants Cremeans and Taylor, and who was asked whether
he had any conversation with the boys and if he heard any
conversation with respect to being over to Rowsy's. He
said he heard some conversation about where they had
been, something to that amount but didn't recollect how it
was he brought it up. An objection to the question and
answer was overruled and exceptions taken. I hardly see
how an objection could be made to the constable's giving any
conversation he had with the prisoners or heard the pris-
oners have in relation to the doings and whereabouts as far as
it appears such conversations were voluntary. The objection
was properly overruled.

Bill of exceptions No. 14 goes to the evidence of John
James a witness on behalf of the state on cross-examination.
The witness having stated certain conversations he had with
Cremeans in the jail about what took place between him and
Taylor the day of the killing and Cremeans' offer to Taylor
of $150 if he wouldn't go before the grand jury, the cross-
examination was in relation to the imprisonment of the wit-
ness when it was brought out that he was in there for the
non-support of his family and had been in there twelve or
fourteen days and was asked, how long he was there the
first time and answered, nine days. He was then asked,
"Had you ever been in there before that?" and on objection
of counsel for state he was not permitted to answer the ques-
tion. For the reasons assigned in relation to bills of ex-

ceptions Nos. 7 and 8 the court did not err in not permitting the witness to answer defendant's question.

Bill of exception No. 15 relates to the cross-examination by the counsel for defendant of witness Joseph Hyatt who stated that he heard a conversation between Cremeans and Tony the Italian who were in jail together. Counsel for defendant stated that he asked to prove by this witness that Tony had never denied the shooting with which he was charged and admitted that he shot with a rifle, and that they wanted to ask the witness if Tony in that conversation might not have been talking to Cremeans instead of Cremeans talking to Tony. The court did not allow the first part of the question but allowed them to ask the witness any question that would show that the Italian was the man who said he shot with the rifle. As the state was seeking to prove that it was Cremeans who used the language or who was talking and said he shot with a rifle and the court permitted the defendant to prove that it was not Cremeans but the Italian who said that he shot with the rifle, the defendant has nothing of which to complain. As to whether the Italian never denied shooting with the rifle, the charge for which he was in jail himself, was immaterial.

Bill of exceptions No. 18 is upon the refusal of the court to permit a question to be asked of A. F. Scott, a witness on behalf of defendant, who was asked if he had a business transaction with Cremeans that week and stated that he had the first part of the week, and was then asked: "Of what did that business transaction consist?" This question was not permitted to be answered and the defendant failed to show its relevancy or what he expected to prove, or for what purpose the evidence was being introduced and it was not error to exclude it.

Bill of exceptions No. 19 relates to the evidence of Colonel Jenkins, a witness for defendant, when he was asked about a gun which he had sold to Cremeans when Taylor and Cremeans came there together: "Before that gun was bought, who tested it? A. All of us. Q. I want to ask you if William Taylor shot there? A. Yes, sir. Q. How many shots? A. Three; I shot two and Grover one." Which questions and answers were excluded from the jury on the objection of the counsel for the state. Witness was

afterwards further asked, whether he had ever seen Grover Cremeans have the rifle in his own hands at any time after that day, and stated that he had not; but had seen Taylor with the rifle on Friday the day before the killing. Taylor having been seen with the same gun so shortly afterwards and only the day before the killing, the questions propounded and answers given, as set out in bill of exceptions No. 19, were pertinent. He was further asked, as set out in bill of exceptions No. 20, after saying that Grover Cremeans had said at the time they got the gun, in the presence of Taylor, that it was a good gun: "I would like for you to state what if anything was said there by either Grover Cremeans or Wliliam Taylor at the time you were testing the gun at your house, before you sold it to Grover Cremeans, about that being the first time that Grover Cremeans had shot off a rifle." To which question counsel for state objected and the objection was sustained. I fail to see the materiality of any answer that might be made to the question and think it was not improperly excluded.

Bill of exceptions No. 29 relates to the examination-in-chief of Cremeans by his counsel as follows: "Did you ever talk to Tony [about the charge of murder against you? A. No, sir. Q. Had you ever been instructed by your counsel to have no conversation about it? A. Yes, sir, I had." To which last question and answer counsel for state objected which objection was sustained. There seems to have been no objection to the first of said questions and answers which were entirely proper; but the last question does not seem to have been proper to be asked, for what his reason might have been for not talking to Tony was immaterial.

Bill of exceptions No. 30 relates to the testimony of witness Saunders Taylor who was re-called and questioned as to a conversation he had with Mrs. Daigh, mother of Cremeans, in relation to William Taylor's shirt, that he had heard that she had one of William's shirts and intended to put blood on it and then swear that it was the shirt he had on the day Smith was murdered, and the witness was asked if she said to him then that she didn't have any of William's shirts and that there was no danger, or words to that effect. An objection to such questions on the part of the defendant was

overruled.   He then was asked, if he had  such  a  conversation with her and answered that he had.    These  interrogatories were propounded in rebuttal, Mrs. Daigh having  been re-called for  recross-examination  when  the  following  question was propounded to her:    " A  short time after the murder of John Smith and the  arrest  of  your  son Grover  and William Taylor, didn't Mr. Taylor  come  to  your  house and ask you about his son William's clothes and  didn't  you  tell him that you had given him all the clothes you  had,  that  he had nothing but  some old rags and,  didn't he  there  tell  you that he had heard that you had one of William's shirts and intended to put blood on it and come  up  and  swear  that was the shirt he had on the  day  Smith  was killed, and did  you not further  say,  that  is  no such stuff,  you  never had  any shirt of William's?"    Which  question was answered in  the negative.    The  court  did  not  err  in  overruling  the  objection.

For the reasons herein stated the judgment is reversed, the verdict of the jury set aside and the case remanded for a new trial.

*Reversed.    Remanded.*