JOHN RATZELL v. STATE.

No. A-4513.    Opinion Filed Aug. 9, 1924.

(228 Pac. 166.)

(Syllabus.)

1. **Searches and Seizures—Search of Unfrequented Premises Remote from Home not Unreasonable.** A search for liquor or appliances for whisky making in woods, thickets, unfrequented ravines, or pastures, not near the place of abode, where the search would in no way invade or disturb the privacy of the home or the legitimate business of the suspected violator of the law, is not an unreasonable search, within the meaning of our Constitution.

2. **Same—Constitutional Protection Invokable Only by One Whose Private Rights Disturbed.** The constitutional protection against unreasonable search or seizure can be invoked only by the person whose private rights have been or may be disturbed.

3. **Intoxicating Liquors—Evidence Sustaining Conviction for Attempt to Manufacture.** The dipping of mash from one vessel into another, where a still and other appliance for making whisky, including 16 or 18 barrels of mash, are also present, constitutes sufficient overt act to support a conviction of attempting to manufacture whisky.

Appeal from County Court, Canadian County; W. M. Wallace, Judge.

John Ratzell was convicted of an attempt to unlawfully manufacture whisky, and he appeals. Affirmed.

E. T. Barbour, for plaintiff in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J.    John Ratzell, plaintiff in error, defendant in the trial court, was on November 9, 1922, by a verdict of a jury rendered in the county court of Canadian county, convicted of an attempt to illegally manufacture whisky on October 17, 1922, with his punishment fixed at confinement in the county jail for a period of three months, and to pay a fine of $250.

Harry Smith, a laborer, in traveling from his place of abode to the northwest section of Canadian county in search of work, passed near a distillery which was in operation and around which there were some three or four people. After having worked for several days for a man by the name of Rollins he started to return to El Reno and in doing so passed through the premises where the still was located, as he had done on the previous occasion. In passing through these premises the second time he came upon some one whom he supposed to be the owner of the premises and who abused and berated him for passing that way and instructed him to stay off the premises.

This man was so vicious and violent in his abuse of Smith that Smith came on to El Reno and informed the officers of the existence of this distillery and about where it was. Smith was taken before a justice of the peace and made affidavit concerning the location of the still and a search warrant was issued and delivered to the officers, authorizing them to search certain premises described as section 35, 15 north, 10 west, alleged to be the premises of H. W. Powell. Smith then accompanied the officers and pointed out to them the distillery, located in a brushy, timbered, unfrequented, ravine on a different tract of land from that described in the search warrant. When the officers approached the distillery they found the defendant, who was not the owner of the land, dipping out mash and pouring it from one barrel to another. There were 16 or 18 barrels full or partly full of mash. They also found a complete distillery set up and in running order, a gasoline heater, and all other paraphernalia necessary for the manufacture of whisky.

As explanatory of the attitude of the defendant when apprehended at the still we quote a portion of the testimony of the arresting officer:

"Q. Did you have a search warrant with you? A. Yes, sir.

"Q. Execute the search warrant? A. Yes, sir. He said he didn't have no use for it when I gave it to him.

"Q. All right; what else was said? A. Well, I don't remember. We had quite a conversation. He told us how he come to be in there. He moved in there with another fellow that had it already set up. Other party moved out; the party that had possession wanted him to move off as soon as he got the batch run off. I don't remember just exactly the words. The reason he hadn't filled up any other barrels, they intended to move off. He said they hadn't made anything since they moved in there; that if we hadn't bothered them they would have made a little out of the run, but the way it was they would not make anything.

"Q. What was he doing? A. He had a half bushel, taking some mash out of a barrel when we walked up on him.

"Q. What was the condition of this? A. Well, it was all set up, this in a barrel with water in it.

"Q. When you refer to this name it, if you please. A. Condenser.

"Q. The condenser was in a barrel of water? A. Yes, sir. One of the pipes was up, I don't remember which one; he said the cows or horses had knocked the other pipe down.

"Q. What I am getting at—was this still set up or partly set up? A. All up, but one pipe had been knocked off.

"Q. What was the condition of the barrels you spoke of around there? The barrels, the 16 or 18 barrels that were full of mash, what kind? A. Corn chops, and I don't know what all. Sugar, yeast.

"Q. Did you taste it to see if it was sweet? A. No, I didn't taste it. And then there was quite a number of barrels that just had corn shops in them, had been wet and the liquor had been taken out of the barrels.

"Q. You say there was yeast there? A. Yes, sir.

"Q. What quantity of yeast? A. Several cakes in a small box they come in.

"Q. What else was there other than the still, the barrels of chops, and the yeast? A. There was a gasoline stove and the gasoline pressure tank and quite a few tools, pliers, half bushel, bucket or two; there was a well there, pulley and ropes."

The defendant claimed that he accidentally discovered the whisky plant and was there examining the outfit out of mere curiosity, and that he had no interest in the still or its operation.

Portions of this whisky making outfit were, over the objections of the defendant, introduced in evidence. The defendant in his brief claims that this conviction should be set aside. First, because the introduction in evidence of the containers and other apparatus was improper, because such exhibits were obtained by an illegal search and seizure; and, second, that there was no overt act proven sufficient to sustain the charge of an attempt to make whisky illegally.

In this state one engaged in the manufacture of intoxicating liquor or in its sale or transportation can claim no property rights in the outlawed, contraband liquor, as against the state, which has a paramount right to its possession. A seizure of such liquor or the utensils used in making it, by a peace officer, is not a seizure of private property belonging to the person in whose possession it is found, like a seizure of private papers or other things of value owned and controlled by the person in possession, which may be used for legitimate purposes. This deduction is made on authority of section 7014, Comp. Stat. 1921, as follows:

"When a violation of any provision of this chapter shall occur in the presence of any sheriff, constable, marshal, or

other officer having power to serve criminal process, it shall be the duty of such officer, without warrant, to arrest the offender and seize the liquor, bars, furniture, fixtures, vessels, and appurtenances thereunto belonging so unlawfully used, and to take same immediately before the court or judge having jurisdiction in the premises, and there make complaint, under oath, charging the offense so committed, and he shall also make return, setting forth a particular description of the liquor and property seized, and of the place where the same was seized, whereupon the court or judge shall issue a warrant commanding and directing the officer to hold the property so seized in his possession until discharged by due process of law, and such property shall be held and a hearing and adjudication on said return be had in like manner as if the seizure had been made under a warrant therefor.''

However, the section of the statutes just quoted must operate in harmony with the provisions of our Constitution relating to search and seizure (section 30 of the Bill of Rights) as follows:

"The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, describing as particularly as may be the place to be searched and the person or thing to be seized."

The question now confronts us: Was this an "unreasonable search and seizure"?

In U. S. v. Bateman (D. C.) 278 Fed. 231, and in People v. Case, 220 Mich. 379, 190 N. W. 289, 27 A. L. R. 686, it was said:

" 'Not all searches nor all seizures are forbidden, but only those that are unreasonable. Reasonable searches, therefore, may be allowed, and if the thing sought be found, it may be seized.' * * * Our Constitution contains both a pro-

vision against intoxicating liquor and against unreasonable search and seizure. Every constitutional provision, as well as statutory, should be construed where possible to give effect to every other constitutional provision in the instrument."

Taking the plain meaning of all words employed in their natural sense, there is no occasion for strained construction in dealing with the two separate prohibitions in the law. Each is clear, independent, and complete by itself. The first recognizes search and seizure regardless of process, but restricted by the word "reasonable," a comprehensive, master adjective compelling in performance the exercise of moderation and good judgment, to the exclusion of prejudice, temper, and passion. The second deals with warrants where time and circumstances permit or in reason require them, specifying restrictive essentials which protect the officer serving them, if fair on their face, even though ultimately shown unfounded and unreasonable—a wise precaution for his protection, as well as the public's.

Our constitutional provision with reference to search and seizure relates to "persons, houses, papers and effects." Another part of the Constitution, with the statutes designed to make the prohibition of the manufacture, sale, and transportation of intoxicating liquor effectual, might be construed as not within the term "effects." A bootlegger has no right of possession of whisky as part of his effects; the right of possession, under section 7014 of our statutes, has been transferred to the state. True, the state has no right to unreasonably invade the privacy of the "person" or the "house" or "papers" of the bootlegger to obtain that possession. The figure of speech, "Every man's house is his castle," implies that it shall not be unreasonably invaded without the owner's consent; and it has been held that "house," "home," or "premises" includes the curtilage surrounding it. "Curtil-

age'' is defined as a yard, courtyard, or piece of ground included within a fence surrounding a dwelling house; the area of land surrounding a house, and actually or by legal construction forming one inclosure with it. Webster's International Dict. The word ''premises'' has practically the same meaning, unless manifestly of a more comprehensive meaning to be deduced from facts or circumstances indicative of some other meaning. Words & Phrases, First and Second Series.

We think it would be stretching the meaning and purpose of this provision of our Constitution too far to hold that these terms include a place in an unfrequented ravine or pasture, not near the place of abode, where a seizure would in no way disturb the privacy of the home or the business or occupation of the suspected violator of the law. These constitutional and statutory provisions were not designed to protect bootleggers, rum runners, or other law violators. They were designed for the protection of innocent persons against arbitrary and unreasonable searches that invade the privacy of the ordinary affairs of life. One who goes into the woods, thickets or pastures of sparsely settled communities in search of contraband goods is not necessarily a trespasser, and a search for outlawed goods in such places may be ''reasonable'' with the meaning of the Constitution. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23.

In People v. Case, supra, the court said:

''These constitutional restrictions like others of that type are concisely stated in general but apt terms, and it was left for the courts of the country to determine in each case or class of cases what under the conditions shown constituted 'excessive bail,' 'excessive fines,' 'cruel and unusual punishment,' 'unreasonable search and seizure,' '' etc. ''The generally recognized rule is fairly stated in the following annotation to 11 Fed Stat. Ann. (2d Ed.) p. 354: 'The question whether a seizure or a search is unreasonable in the

language of the Constitution is a judicial and not a legislative question; but in determining whether a seizure is or is not unreasonable, all of the [facts and] circumstances under which it is made must be looked to.' ''

The conclusion herein stated is not intended to modify in any particular the holdings of this court in Gore v. State, 24 Okla. Cr. 394, 218 Pac. 545.

There is still another reason why this defendant has no right to complain of an unreasonable search and seizure. There was no showing that the defendant was the owner of this thicket or ravine, nor that his home, permanent or temporary, was adjacent thereto. This constitutional protection may be invoked only by the person whose private rights have been or may be disturbed.

Construed along with other parts of the testimony, the part of the evidence quoted shows a sufficient overt act to support a conviction for an attempt to make whisky. A mere spectator, wholly disinterested except for curiosity, would hardly be engaged in transferring mash from one container into another, with a still close at hand and other appliances for making whisky likewise there. This fact together with defendant's declarations as to what he had done in furtherance of the purpose to make whisky and what he was expecting to do, when intercepted, was sufficient. State v. Thomason, 23 Okla. Cr. 124, 212 Pac. 1026; Neivar v. State, 26 Okla. Cr. 112, 222 Pac. 279.

The judgment of the trial court is affirmed.

MATSON, P. J., and DOYLE, J., concur.