# CHARLESTON.

STATE *v.* A. V. RUSH

(No. 6615)

Submitted November 20, 1929.  Decided November 26, 1929.

*A. F. McCue* and *M. M. Neely, Myron B. Haynes* and *E. L. Maxwell,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *W. Elliott Nefflen,* Assistant Attorney General, for the State.

HATCHER, JUDGE:

The defendant was found guilty upon an indictment charging him with embezzlement of money belonging to The Peoples Bank of West Virginia, of which he was cashier. A sentence of ten years in the penitentiary was imposed. He complains here of that verdict and judgment, charging the following errors:

"1. The jury was improperly impaneled. Two jurors were permitted to remain on the jury who should have been excused by the Court.

"2. The testimony of H. Roy Waugh, U. G. Young and J. C. McWhorter violated the rule protecting confidential communications between attorney and client.

"3. The confessions of the defendant, made upon the assurances of a Deputy Commissioner of Banking of West Virginia, in the presence of members of the board of directors of the bank of which the defendant was then cashier, that such confessions could not be used in a criminal case against him, were (a) not voluntary confessions, and (b) were made

to persons at the time in authority and should not have been admitted in evidence.

"4. There is evidence of every other kind of irregularity in this record except the one charged against the defendant by the indictment. The evidence is not sufficient in fact and there is no evidence of embezzlement by the defendant of money belonging to the bank as charged in the indictment.

"5. The court refused to give proper instructions to the jury on behalf of the defendant.

"6. The court gave improper instructions on behalf of the State.

"7. The court erred in refusing to set aside the verdict."

(1) Two members of the panel from which the jury was selected were closely related to depositors in The Peoples Bank. The bank was insolvent, and those affected thereby felt bitterly toward the accused. The two veniremen stated that they were not conscious of bias toward him. That may have been true, but it is only human nature that they should have shared to some extent the feeling of their kinsmen against him. They should have been excluded from the panel. Neither of the two, however, served on the jury which tried the accused.

(2) H. Roy Waugh, a director in the bank, attorney and former circuit judge, J. C. Whorter, an attorney and former circuit judge, and U. G. Young, an attorney, were permitted to testify as to certain statements to them by the defendant, which were made in the following manner: One afternoon he went to the office of Judge Waugh and announced that he was going to shoot himself, as the bank examiners were there and would discover that he was short in his accounts with the bank over $100,000.00, and requested Judge Waugh to take an interest in his wife and child. The judge first "shamed" the accused out of the idea of suicide, and afterwards asked him if the president of the bank knew about the situation. The accused replied that he did not. An effort to locate the president was unsuccessful. Mr. Young, who was a large stockholder in the bank, was then called, and the accused stated to him the shortage, with some detail. At

Mr. Young's suggestion several directors of the bank were called into conference and the accused explained the situation to them. It was then decided to secure the advice of T. A. Whalen, an experienced banker at Weston, on what should be done in the best interests of the bank. The accused says he received the impression that Judge Waugh and Mr. Young would represent him as attorneys, and states in support thereof that during the conference in Judge Waugh's office he (the defendant) said that he had no money and Judge Waugh replied that he didn't want any money; that if he had the money he would take care of the whole thing himself; that the accused had always been a friend of his and he would do any honorable thing in the world for him. The accused further states that both attorneys assured him that he should have fair play. Neither Judge Waugh nor Mr. Young understood at the time that the accused was expecting him to act as his counsel. Both attorneys say the accused seemed to be afraid of personal violence, and that he discussed means of making up the shortage. Judge Waugh says ''a legal defense, or legal matters was not discussed.'' Mr. Young says that he recalls nothing that was said by the accused indicating an expectation to be represented professionally by him (Young), or that was said by himself to the accused to warrant such expectation. Authority is cited to the effect that a communication to an attorney, made by one who is under the impression that the relation of attorney and client exists, is privileged even though the attorney himself did not understand that he was retained. 28 R. C. L., p. 555. That may be a sound rule, but we are of opinion that ordinarily something more must be shown than the mere assertion of such an impression by the layman. One would not infer here from the statement and request the accused first made upon entering Judge Waugh's office that he desired an attorney, but rather that he was seeking the solace of a friend. His subsequent conduct there—explaining his shortage to the directors of the bank, and endeavoring to find a way to replace the shortage—opposes the inference that he made the statement of Judge Waugh and Mr. Young under

the seal of professional relationship. The evidence indicates that the conference was on financial instead of legal matters. In attempting to have his communication to these gentlemen classed as privileged, the burden is upon the accused. *Woodrum* v. *Price*, 104 W. Va. 382. He has not sustained that burden. Later, that same evening, he asked Mr. McWhorter to represent him as attorney. Mr. McWhorter refused to do so. Therefore, whatever statements were made to Mr. McWhorter were clearly not privileged.

(3) Evidence as to the defendant's general shortage with the bank was admitted during the trial. But when the case was submitted to the jury, it was directed by the court not to consider evidence as to shortage of bank notes, securities or any other property or effects of the bank except as tending to show the "intent, system and method of the accused in the alleged embezzlement of money." As so limited, we see no error in the admission of the evidence as to the general shortage. 16 C. J., p. 596, sec. 1159; Underhill's Criminal Evidence, 3rd Ed., sec. 447; Jones Comm. on Evidence, Vol. 2, sec. 626, p. 1164; Wigmore on Ev., 2nd Ed., sec. 304. An assistant bank examiner was present at the conference with Mr. Whalen at Weston. The accused was interrogated by the examiner relative to the shortage of the bank. Before responding the accused asked whether what he should say on that occasion could be used against him in a criminal prosecution. He was assured by the examiner that he did not think it could be so used, and was cited to trials within the examiner's experience when such statements had been declared inadmissible. On that representation, the accused then made certain admissions and statements as to the shortage, which were used against him at the trial.

Code, Chapter 54, section 81a(4) gives to the commissioner of banking (or an assistant commissioner) the power to examine the officers of a bank relative to its solvency. Section 81a(5) as amended by Acts 1925, Chapter 34, section 81a(5) requires banking officials to disclose fully to the commissioner "all the institution's indebtedness and liability", and makes it a misdemeanor for such officials to refuse to furnish this

information. It is a well established rule that an extra-judicial confession to one in authority cannot be used against the accused unless it was made freely and voluntarily. *State v. Zaccario,* 100 W. Va. 36. The power given the commissioner by the above statutes clearly makes him *one in authority,* within this rule. See generally, Bishop's New Cr. Pro., 2nd Ed., Vol. 2, sec. 1234, and opinion in *State v. Stroud,* 107 W. Va. 591. The statements made by the accused at the Weston conference were not free and voluntary, but because of the assurance of the assistant examiner that the statements could not be used against him. Such statements were therefore inadmissible. However, they differed in detail only from the admissions made in Judge Waugh's office, which were admissible.

(4) On the fourth assignment of error, the attorney general has made diligent search of the record and points to evidence of numerous instances in which the accused admitted taking actual money from the bank. At the time the examiner took charge of the bank, its cash account showed $15,473.23 on hand. The actual cash found in the bank was $4,603.93. There were *bona fide* cash items of customers amounting to $6,528.55, and the balance of $4,340.75 was represented by cash items of defendant. The cash items consisted of five personal checks and eight debit slips signed by the defendant and carried as cash on hand. The State Banking Commissioner, H. A. Abbott, testifying as to some of the cash items which the accused had discussed with him, said that the accused stated that the items represented funds of the bank which had been abstracted wrongfully by him, and that those cash items were left in the cash drawer to cover up or be used to balance the cash account. On being interrogated as to a cash item of $2500.00, Mr. Abbott said that the accused "conveyed to me emphatically and without a question of doubt the fact that that particular item represented money which he had taken from The Peoples Bank of West Virginia." Mr. Abbott further said that the accused stated that two other cash items of $450.00 and $100.00, respectively, "represented a part of his shortage, or cash

which he had taken from the bank." None of this evidence was denied by defendant. Therefore, we find that the charge of money taken from the bank is specifically proven.

(5, 6, 7) The three remaining assignments of error will be treated under one head. Let us admit for the sake of argument that the court erred in giving and rejecting instructions. How was the accused prejudiced thereby? How, also, was he prejudiced by any other error committed by the trial court? Since competent evidence demonstrates conclusively that the accused took money from the bank as charged in the indictment, what difference does it make whether the two veniremen were biased, or whether some of the admissions the defendant made as to his shortage were improperly admitted, or whether the jury was properly charged? The accused was, of course, entitled to a fair trial. But the term "fair trial" does not imply a perfect trial. A trial without prejudice to the accused is a fair one. And because a perfect trial is rarely, if ever possible, necessity and common sense have evoked the rule of "harmless error", as to error which does not prejudice. *Oliver* v. *Comm.*, (Va.) 145 S. E. 307, 309. That rule is: a verdict will not be reversed merely because of error committed by the trial court, but only when the error has been harmful to the appellant. Standard Ency. Procedure, Vol. 2, p. 457. Neither bias, nor incompetent evidence, nor improper instruction was requisite in the least degree in this case to lead the jury to its verdict. The competent evidence compelled a return of guilty. Under that as to the cash items alone, the jury could not properly have found any other verdict. The rule of "harmless error" is settled law in this state. *State* v. *Lane*, 44 W. Va. 730; *State* v. *Miller*, 85 W. Va. 326; *State* v. *Smith*, 97 W. Va. 313; *State* v. *Dephenbaugh*, 106 W. Va. 289, 145 S. E. 634.

The judgment of the circuit court is accordingly affirmed.

*Affirmed.*

MAXWELL, JUDGE, concurring:

I concur in the result, but I do not concur in certain features of the opinion. When it appeared on *voir dire* that

two of the jurors were related to certain depositors in The Peoples Bank of Buckhannon, the court carefully interrogated each as to whether or not, because of such relationship, he entertained any prejudice against the defendant. Each answered unequivocally in the negative. Assuming that they were honest men, their answers must be taken as true, unless it can be fairly said that the circumstances were such as to create unconscious prejudice in their minds. I am unable to take the latter position. Those jurors were not disqualified *per se* because of their relationship to certain depositors and their answers to the court's inquiries were such as to carry conviction to the mind of the court that they were not disqualified because of prejudice. While an abundance of caution on the part of the trial court might have suggested the advisability of excusing the two challenged jurors from the panel, the court's action in retaining them cannot, in my judgment, be said to constitute erroneous procedure. An accused is entitled to a panel of twenty legally qualified jurors, "free from exception", Code Chapter 159, section 3. An exception, however, as contemplated by the statute, must be real and not inconsequential. It is significant that after the negative answers of the jurors to the court's specific inquiry as to whether they entertained prejudice because of the relationship mentioned, there was no further inquiry made of the two jurors by counsel for the defendant with reference to prejudice. Their negative answers to the questions of the court constituted the last word on the subject. No effort was made to probe their conscience nor to develop the possibility of unconscious prejudice. Where a juror's answers are so unequivocal and satisfactory as to convince the trial judge of the juror's fairness and impartiality, it is the settled practice not to interfere with the court's finding, unless clearly against the evidence. *State* v. *Toney*, 98 W. Va. 236. A depositor in a bank stands on the basis of a creditor. A juror's relationship to such creditor does not necessarily disqualify him from sitting in the trial of a person charged with embezzling assets of the bank. If a juror's relationship

were to a stockholder rather than a creditor or depositor we would have a more serious situation.

Much reliance is placed on the exception taken to the action of the court in giving to the jury state's instruction No. 2 over the objection of the defendant. It reads: "The Court further instructs the jury that after they shall have compared and considered all the evidence in this case, if they have a reasonable doubt as to the guilt of the prisoner as charged in the indictment they cannot convict; that by reasonable doubt is meant such a doubt, based upon the evidence, as the jury may honestly and reasonably entertain as to any material fact essential to prove the claim charged. It must not be arbitrary doubt without evidence to sustain it, but must be serious and substantial in its nature in order to warrant an acquittal and a doubt which the jurors may honestly and conscientiously entertain." The last part of the instruction is the portion challenged. It is said that the statements in the instruction that it (meaning a reasonable doubt) must be "based upon the evidence" and "must not be arbitrary doubt without evidence to sustain it" are not sound. If these words mean merely that a doubt to be reasonable must not be chemerical and inconsequential, but must be such as may develop in reasonable minds from the whole evidence, then there is nothing wrong with the statements; but if they must be interpreted to mean that a reasonable doubt cannot be entertained except when based upon affirmative testimony, then they are not sound, because reasonable doubt may properly arise from a lack of sufficient evidence on the part of the state. Perhaps the challenged phrases are not so clear as they ought to be, but instructions embodying this proposition have, in more than one case, been approved by this Court. In *State* v. *Koch*, 75 W. Va. 648, an examination of the printed record discloses that state's instruction No. 1 contains the phrases which are here challenged. The Court said: "We see no error in this instruction." *State* v. *Staley*, 45 W. Va. 793, the same proposition appears in state's instruction No. 6. It was approved. The matter has, therefore,

heretofore stood the test. We should not depart from settled precedent unless we are satisfied that such precedent is essentially erroneous. While this instruction may not be a model for clarity, it is not, in my judgment, prejudicially erroneous in a trial where the state's proof of the defendant's guilt is abundant and convincing.

The reasons why I do not think the court erred in refusing defendant's instructions Nos. 3, 4 and 17 (especially pointed out by defense counsel) are as follows: Number 3 is substantially covered by state's instruction No. 1 and defendant's instruction No. 5. Number 4 would have told the jury that one of the elements of the crime charged necessary to be proved by the state beyond all reasonable doubt was that the defendant converted to his own use the money described in the indictment "without any intention of making restitution thereof." Since it is settled law that restitution of embezzled property will not cure the crime, I do not perceive how, where money is misappropriated by an employee to his own use with intent to deprive the owner thereof, a latent intent to make restitution at some later date, existing in the mind of the accused at the time of the misappropriation can be deemed an efficient inoculation against criminality. "If S drew the money on the Avery check with the intention of using the same for his own purposes, and not for the liquidation of the Avery debt, though probably with the intention to return the same some future day, to the building association, he is guilty of the embezzlement of the check." *Shinn* v. *The Commonwealth*, 32 Gratt. 899, Syl. 7. The essential background of restitution, as applying to embezzlement, is that there has been absolute appropriation by the wrongdoer. There can be restitution only after complete misappropriation. Intent in the mind of an accused at the time of misappropriating another's property, to make restitution at some later time, therefore, means an advance purpose to return the property to the owner subsequent to the time that the misappropriation is consummated. I do not think that criminal conduct can be excused on any such refinement. It would enable an embezzler to exonerate himself by saying, "True,

I took my employer's money and speculated with it, but it was my intention to make restitution." Of course, where an employee retains money of his employer without concealment or under a claim of right there is no criminal intent and consequently no embezzlement. But that is not the proposition in hand.

Number 17 reads: "The court further instructs the jury that if they believe from the evidence that the alleged confessions and admissions of defendant, to the respective witnesses who testified about them, are of a general nature and do not refer to names, dates and amounts as alleged in the indictment, or the Bill of Particulars, in this case, then the jury should not consider the same in arriving at their verdict." I do not think this instruction is correct, because it is at variance with settled law that on an indictment for embezzlement there may be proof of other transactions than those alleged in the indictment, for the purpose of establishing intent, plan, scheme or design on the part of the defendant, and to negative mistake.

I do not feel that the wholesome rule of law that a judgment of conviction will not be disturbed when the jury could not, under the evidence, properly have returned a different verdict constitutes a panacea for all sorts of error. It is a righteous rule, but I do not believe there is necessity for invoking it here.