STATE OF WEST VIRGINIA

*v.*

ELMER DAVID BRUNER

(No. 10947)

Submitted September 3, 1958. Decided October 7, 1958.

*Robert O. Ellis, Jr., Norman E. Rood,* for plaintiff in error.

*W. W. Barron,* Attorney General, *Giles D. H. Snyder,* Assistant Attorney General, for defendant in error.

GIVEN, JUDGE:

The defendant, Elmer David Bruner, was indicted by a grand jury of the Common Pleas Court of Cabell County at the June, 1957, Term, for the murder of Ruby Miller. The homicide occurred on the twenty-seventh day of May, 1957. A jury, on June 29, 1957, returned a verdict of "guilty of murder in the first degree as charged in the within indictment", without recommendation. The court, on August 2, 1957, adjudged that defendant "be put to death by electrocution", on September 27, 1957. A writ of error and supersedeas to that judgment was denied defendant by the Circuit Court of Cabell County on October 29, 1957.

John E. Miller, husband of Ruby Miller, on the morning of May 27, 1957, had breakfast with Mrs. Miller at their home in the City of Huntington. Later in the morning, Mrs. Miller, who sometimes assisted her husband with his office work, driving an automobile owned' by her husband, went to the office and remained there until sometime in the afternoon. On the return of Mr. Miller to the home, shortly after five o'clock in the afternoon, Mrs. Miller was discovered to be dead.

When found, the body was lying on its back on a bed, "the head was bashed in and completely, and matted with blood, still wet on the scalp, mostly to the right side of the head". There was a silk stocking wrapped tightly around her neck and "There was cloth and adhesive over the eyes of the body". Doctor S. Werthammer, a pathol-

ogist who was called to the Miller home by members of the Police Department of the City of Huntington a short time after discovery of the homicide, and who later performed an autopsy on the body, stated that the cause of her "death was destruction of the brain * * * caused by a very hard instrument, which was short and fairly sharp. Sharp enough to produce a gaping wound, but not sharp enough—let's say like a knife or an axe". Examination of substances found in the vaginal area of Mrs. Miller revealed the presence of live or "intact" spermatozoa, which, in the opinion of the pathologist, were "emitted shorter than twenty four hours" before the autopsy and subsequent to the death of Mrs. Miller.

A short time after the discovery of the homicide a member of the Police Department of the City of Huntington, a professional photographer, took a picture of Mrs. Miller, which was later developed by him and admitted in evidence as State's Exhibit No. 2. He testified to the effect that the picture correctly portrayed the "scene as you saw it at the time" the picture was taken. Other witnesses testified to the effect that the picture correctly portrayed the scene as it existed very shortly after the discovery of the homicide. Defendant objected to the admission of the picture for the reason that it was "of a prejudicial character" and was "calculated to arouse sympathy and prejudice of the jury * * *".

Defendant was arrested at about six o'clock on the evening of the homicide, and his person searched. At the time of his arrest there were taken from his person certain keys. After defendant had informed officers that one of the keys belonged to the automobile driven by Mrs. Miller and that he had parked the automobile in a certain parking lot in the City of Huntington, officers went to the lot, found the automobile parked there and that the key "operated it and fitted it". Another of the keys so taken from the person of defendant at the time of his arrest was a "key to a locker at the Greyhound bus station" in the City of Huntington. The defendant informed the

officers that the key was for the locker, that "two suit-cases" were in the locker and some "personal clothing and said there was a gun in the suitcase". When advised by the officers that they were sending someone to the locker for the purpose of obtaining the suitcases, no objection to that action was made by defendant. Neither did defendant express any objection to the proposed search of the locker or the suitcases. The suitcases were found in the locker bearing the same number as the number on the key, and contained a number of articles, mostly jewelry, taken from the home of Mr. and Mrs. Miller. A carton containing a "used package of cigarettes and two unopened packages of cigarettes" was also found in one of the suit-cases. The cigarettes found were of the same brand as partly burned cigarettes found in the home of Mr. and Mrs. Miller at about the time of the discovery of the homicide. Neither Mr. nor Mrs. Miller had smoked the partly burned cigarettes. No warrant authorizing any search or seizure was issued to or requested by the officers.

On the evening of May 27, the day of the homicide, some-time before midnight, after considerable, but not con-tinuous, questioning, defendant admitted his guilt to the officers. A written statement was then prepared for the signature of defendant. However, he refused to sign the statement until about four-thirty P. M. of the following day. The statement, admitted as evidence, signed and sworn to by defendant, reads:

"May 28, 1957 12:05 A. M. My name is Ted T. Barr. I am a Detective on the Huntington Police Dept. This is Bernard Tomlinson, he is a Detective First Sergeant on the Huntington Police Dept. Do you care to give us a statement at this time?

"I guess I am guilty of doing it. I went in the bathroom window and ransacked the home and was getting ready to leave getting ready to leave out the bedroom door I opened it there was a woman standing with a gun at me. I grabbed the gun and took it away from her she threw up her hands and started screamin I picked up something

and started hitting her with it I don't know how many times I hit her she backed over toward bed fell on the bed. I remember getting something and putting it over her eyes, you all said there was a stocking around her neck, after I got through hitting her I don't see no reason why I should put a stocking around her neck and I don't remember doing if I did and I know I didn't take her clothes off of her, I took the car and left and just drove around and parked it at St. Mary's. Started I reached home when they got me.

"Questions by Detective Sgt. Bernard Tomlinson and Detective Ted Barr. Answers by David Bruner.

"Question: David, what time did you enter the house where you hit the woman? Answer: About 11:00 A.M. I imagine I couldn't say for sure. Question: What day was this? Answer: Monday. Question: Do you know what month and year it was? Answer: Yes, May, 1957. Question: David, do you know where the house is located that you entered through the bathroom window? Answer: Over on Washington Boulevard. Question: Do you know anyone who lives at that house? Answer: No. Question: David is the same house where the lady discovered you and she had a gun in her hand and you grabbed the gun from her hand? Answer: Yes. Question: David is this house located in Huntington, Cabell County, State of West Virginia? Answer: Yes. Question: David, when you first entered the house in question, did you see or hear anyone in the house? Answer: There was no one there. Question: When did you discover that there was someone in the house? Answer: As I was getting ready to leave. Question: How did you discover it then? Answer: I opened the door and she was standing there with the gun in her hand. Question: David, had you ever seen this woman before? Answer: No. Question: David, how did you enter the house? Answer: I cut the screen with a knife, and unlocked it and raised the window. The window was unlocked. Question: David, when you saw the woman standing there with a gun, what was the first thing you did? Answer: Grabbed

the gun. Question: Did you say anything to her? Answer: No. Question: Did she say anything to you? Answer: She throwed up her hands and started screamin. Question: David, do you know what you used to hit her with? Answer: I don't remember. Question: Where did you get it from? Answer: It was layin beside the dresser. Question: David, how many times did you hit her? Answer: I don't remember, I lost my head. I don't know what I was doin. Q. Did you lay her on the bed? Answer: She was backing up, she fell on the bed. Question: Then did you place on the bed? Answer: One foot was hangin down off the bed. I didn't touch her. Question: Did you hit after she fell on the bed? Answer: I don't know if I did or not. Question: Did she say anything at all while you were in the house? Answer: No. Question: David, after you hit her and she fell on the bed, was it then that you covered up her eyes? Answer: Yeah. Question: What did you use to cover her eyes? Answer: I got something out of the bathroom, towel or gauze or somethin bound to been tape. Question: Why did you cover her eyes? Answer: The way she was lookin. Question: Did you cover her with anything? Answer: I only covered her eyes, that's all. Question: When did first notice the articles on the bed? Answer: Before I ever seen her. Question: Did you take any clothes out of the closet? Answer: No. Question: Before now, did you tell anyone where you parked the car that you took from the house? Answer: Only you all. Question: David, why did you pick this particular house to burglarize? Answer: I don't know, I was just out that way I guess. Question: David, you went to that house with the intention of committing a burglary, is that right? Answer: Yes. Question: What did you take from the house? Answer: Jewels that I could find. Question: And the automobile? Answer: Yes. Question: David can you name any specific articles you took out of the house? Answer: No. Question: David what did you do with the articles you took out of the house? Answer: I put them in a box and put them in a locker at the Greyhound depot. Question: David do you know a Mr. J. E. Miller or his son Dorman Miller or any-

one related to Mr. Miller? Answer: No. Question: David did you ever work for the J. E. Miller Construction Co? Answer: No. Question: Had you ever been in that home before yesterday which was Monday May 27, 1957? Answer: No. Question: David what kind of clothing were you wearing when you entered the Miller home? Answer: Blue pair of pants I don't know what kind of shirt I had on yellow I believe, pair of black slippers, light blue jacket and grey hat. Question: Where are these articles of clothing now? Answer: You all got them. Question: David I believe you stated—earlier when we were talking to you that you bought a case of beer on 20th Street and drank a half a can and it made you sick so you threw the rest of it away is that right? Answer which was six cans. Question: In other words you threw away five and one half cans is that right? Answer: Yes. Question: Now David I also believe you stated earlier that you had had nothing else to drink that day? Answer: I don't drink. Question: David do you take any kind of dope? Answer: No. Question: David can you read and write? Answer: Yes, a little. Question: David are you aware of the seriousness of your crime? Answer: Yes. Question: This statement you are giving us is of your own free will and without any threats or promises being made to you is that correct? Answer: Yes. Question: David you are also aware of the fact that anything you tell us can and will be used in court as evidence against you are you not? Answer: Yes. Question: David was there any one with you when you entered the J. E. Miller residence on Washington Blvd. or when you attacked the woman who was in this house? Answer: There was no one with me but there was some one else there after I left. Question: Who was there after you left? Answer: I don't know. Question: David— were you by your self when you drove the car away from the Miller house? Answer: —yes. Question: Were you by yourself all the time you had this car? Answer: Yes. Signed: ELMER DAVID BRUNER Witnesses: TED R. BARR."

Other pertinent facts will be referred to in discussions

of the particular questions to which they relate. Numerous assignments of error are made by defendant, but we think all substantial contentions are included in questions relating to the sufficiency of the indictment, the denial of a motion for change of venue, the admission of certain evidence, the validity of the search of the locker, and the giving and refusing of certain instructions.

The indictment contained a statement to the effect that it was found on the testimony of certain named witnesses, who were sworn and "sent before the Grand Jury at the June term of said Court, 1957". The only contention as to the invalidity of the indictment is that it should have stated that the witnesses were sent before the grand jury on a certain day. The contention is based on the wording of the form provided in Code, 62-9-1, 3. The statute, however, does not require such an indictment to be in the precise wording indicated in the form, the provision being only that the indictment shall be deemed sufficient "if it be in form, tenor or effect as" indicated in the form. We think the language used in the indictment constitutes a substantial compliance with the directory provision of the pertinent statute. The exact language of the form is "not indispensable" to a valid indictment. *State* v. *Burnette*, 118 W. Va. 501, 190 S. E. 905. See *State* v. *Huffman*, 141 W. Va. 55, 87 S. E. 2d 541; *State* v. *Howard*, 137 W. Va. 519, 73 S. E. 2d 18; *State* v. *Johnson*, 134 W. Va. 357, 59 S. E. 2d 485.

The motion of defendant for a change of venue was based on a petition of defendant timely presented to the court, together with copies of clippings from a newspaper of wide circulation in Cabell County, and an affidavit of the attorneys for defendant. The petition alleges, in effect, that "newspaper, radio and television agencies and services operating within * * * Cabell County * * * did utter, publish and circulate full and comprehensive bulletins, broadcasts * * * relating to the facts and circumstances surrounding the alleged murder" and that many false statements and actions were charged against defendant, all of

which made "it impossible for this Petitioner to obtain a fair and impartial panel of jurors within this County voir dire notwithstanding". The affidavit shows that the affiants, after being appointed by the court to represent defendant, made "extensive interviews and investigations", and that "numerous residents of this county * * * have formed definite and conclusive opinions that the said Elmer David Bruner is guilty", and that affiants were "of the opinion that the said Elmer David Bruner is greatly prejudiced thereby and cannot obtain a fair and impartial panel of jurors in Cabell County, West Virginia, voir dire notwithstanding". The nature of the published articles complained of is made clear by Plaintiff's Exhibit No. 1—copies of newspaper clippings containing some of such articles. No evidence was tendered by the State in opposition to the motion. No complaint is made by defendant as to the qualification of any juror.

We see no error in the action of the trial court in overruling defendant's motion for a change of venue, though it can not be doubted, from the evidence tendered, that many citizens of Cabell County, perhaps subject to jury duty, had formed opinions as to the guilt of defendant and were prejudiced, yet there is nothing in the record to establish, or even indicate, that such opinions or prejudice was so wide or extensive as to prevent the obtaining of a fair and impartial jury from Cabell County. Though such opinions and such prejudice may have created difficulties in the impaneling of a jury, mere difficulties do not require the granting of such a motion. Even difficulties in the instant case are not established. While actions of trial courts on such motions may be reviewed by this Court, the determination of the right of a defendant to a change of venue is a matter ordinarily within the discretion of the trial court. The burden of showing the existence of a necessary basis for a change of venue rests on the defendant. *State* v. *Wooldridge,* 129 W. Va. 448, 40 S. E. 2d 899.

The contention of defendant as to the admission of improper evidence relates to the evidence of Doctor Wert-

hammer as to the finding of live or "intact" spermatozoa, the picture introduced in evidence as State's Exhibit 2, the articles obtained by the search of the locker, and the confession of defendant.

No objection was made by defendant as to the admission of the evidence of Doctor Werthammer relating to the finding of the spermatozoa in the reproductive tract of Mrs. Miller, though a general objection was made and overruled, as to a question relating to the probable time of the emission of the spermatozoa. See 1 M. J., Appeal and Error, Section 113. Though the objection be deemed sufficient, we see no error in admission of the statements of Doctor Werthammer as to the examination and findings. While the evidence perhaps fails to definitely connect defendant with having had, or having attempted to have, sexual intercourse with Mrs. Miller, the facts related were such as to entitle the State to present them for jury consideration, in the circumstances of this case. It must not be overlooked that the State's case against defendant was that the homicide was committed in the commission by defendant of a felony. While the evidence established only the commission by defendant of robbery or burglary, rape is one of the felonies named in the statute declaring the killing in the commission of such to constitute murder in the first degree. Code, 61-2-1. Though the State failed in its attempt to establish rape, it was justified in attempting to do so. We see no prejudice in the admission of such evidence. See *State* v. *Evans,* 89 W. Va. 379, 109 S. E. 332; *State* v. *Prater,* 52 W. Va. 132, 43 S. E. 230.

We think it well established that the photograph admitted in evidence as State's Exhibit 2, the admission in evidence of which defendant complains, correctly portrays the scene existing at the time the picture was taken; that it was properly developed and identified; and that it was taken shortly subsequent to the discovery of the homicide. We think the admission thereof was not prejudicial error. See *State* v. *Wooldridge,* 129 W. Va. 448, 40 S. E. 2d 899; *State* v. *Whitt,* 129 W. Va. 187, 40 S. E. 2d 319; *State* v.

*Goins,* 120 W. Va. 605, 199 S. E. 873; *Newberry* v. *Commonwealth,* 191 Va. 445, 61 S. E. 2d 318.

Defendant says that the admission in evidence of the several articles obtained through the search and seizure, described above, constituted prejudicial error for the reason that the search and seizure were unreasonable and without warrant, in violation of Federal and State constitutional provisions. The State contends that the place at which the search was made does not come within the purview of such constitutional provisions, and though within the purview of such provisions, defendant, by not objecting to the search at the time he was informed by the officers that the search was intended, waived any constitutional right as to the search. We have concluded that the locker at the bus station, to which locker defendant possessed a key, was not such a place as is within the purview of the constitutional provision.

Not all searches and seizures are prohibited by the constitutional provisions, only such as are "unreasonable" are prohibited. 79 C. J. S., Searches and Seizures, Section 8. Except in instances made illegal by statute, and in instances not material here, the constitutional guaranties relate to the search of a place of habitation, including curtilage and appurtenances. Id. Sections 12 and 13. The provisions of the West Virginia Constitution, being substantially the same as the pertinent provisions of the United States Constitution, "should be given a construction in harmony with the construction of the federal provisions by the Supreme Court of the United States." *State* v. *Andrews,* 91 W. Va. 720, 114 S. E. 257, Part Point 2, Syllabus.

In *Hester* v. *United States,* 265 U. S. 57, 44 S. Ct. 445, 68 L. ed. 898, officers obtained, without search warrant, from outside the house, a jar containing illegal whiskey. In disposing of the question relating to an illegal search, Mr. Justice Holmes said: "* * * As to that, it is enough to say that, apart from the justification, the special protection accorded by the Fourth Amendment to the people

in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl. Comm. 223, 225, 226." See *State* v. *Kees,* 92 W. Va. 277, 114 S. E. 617.

In *Carney* v. *United States,* 163 F. 2d 784 (9th Cir.), certiorari denied, the Court held that a "garage at rear of premises on which house was located", was not within the purview of the constitutional provision. In *Martin* v. *United States,* 155 F. 2d 503 (5th Cir.), where officers found a jug of tax unpaid whiskey near the automobile of defendant, and a key which unlocked the door to a house in which officers found other tax unpaid whiskey, it was held that the search and seizure constituted a single transaction, and that no warrant authorizing the search was necessary. In *Stark* v. *United States,* 44 F. 2d 946 (8th Cir.), it was held that a search without a warrant of a cave was not illegal, it not being shown that the cave was used by defendant as a home. In *Koth* v. *United States,* 16 F. 2d 59 (9th Cir.), a search without a warrant of a house one-fourth of a mile from defendant's residence was held not illegal. See *Carroll* v. *United States,* 267 U. S. 132, 45 S. Ct. 280, 69 L. ed. 543; *Boyd* v. *United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. ed. 746; *Janney* v. *United States,* 206 F. 2d 601 (4th Cir.); *United States* v. *Shafer,* 132 F. Supp. 659, affirmed 229 F. 2d 124, certiorari denied; *Care* v. *United States,* 231 F. 2d 22 (10th Cir.); *Thomas* v. *United States,* 154 F. 2d 365 (10th Cir.); *Gay* v. *United States,* 8 F. 2d 219 (9th Cir.).

In *Carples* v. *Cumberland Coal & Iron Co.,* 240 N. Y. 187, 148 N. E. 185, 39 A. L. R. 1211, it was held that the search of a safety deposit box, without a warrant, was not an unconstitutional search, "there being no proper analogy between a man's home and a safe deposit box". In *Robie* v. *State,* 117 Tex. Cr. Rep. 283, 36 S. W. 2d 175, a search, without a warrant, of an old, unoccupied house three or four hundred yards from the residence, was held not illegal. See *State* v. *Montgomery,* 94 W. Va. 153, 117 S. E. 870;

*State* v. *Kees,* 92 W. Va. 277, 114 S. E. 617; *State* v. *Wills,* 91 W. Va. 659, 114 S. E. 261, 24 A. L. R. 1398; *People* v. *Ring,* 267 Mich. 657, 255 N. W. 373, 93 A. L. R. 993; *Ratzell* v. *State,* 27 Okla. Cr. 340, 228 P. 166; *State* v. *Ladue,* 73 Mont. 535, 237 P. 495.

The holding that the search of the locker and the examination of the contents of the two suitcases found therein did not constitute an unreasonable or unconstitutional search, and that articles found in the suitcases were properly admitted as evidence, renders unnecessary, if not improper, any discussion of the question of waiver by defendant of his constitutional rights as to the search, or the question as to whether such evidence was prejudicial to defendant. See, however, *State* v. *Taylor,* 130 W. Va. 74, 42 S. E. 2d 549; *State* v. *Littleton,* 108 W. Va. 494, 151 S. E. 713; *State* v. *Rush,* 108 W. Va. 254, 150 S. E. 740; *State* v. *Montgomery,* 94 W. Va. 153, 117 S. E. 870; *State* v. *Evans,* 94 W. Va. 47, 117 S. E. 885.

The basis of defendant's contention that the admission of the confession quoted above constituted prejudicial error is that the confession was obtained through coercion, and as a result of duress on the part of the officers. The principle that such a confession, to be admissible as evidence, must have been voluntary, without promise or threat, is so universally recognized and so often applied that we need not discuss it again. We need only determine whether the confession here was made in accordance with the principle.

The defendant did not testify before the jury, and no evidence was offered by him. In chambers, on the hearing by the trial judge on the question of whether the confession was made voluntarily, the defendant testified to the effect that he was sick on the day of the homicide, and had eaten nothing for two days; that one of the officers who made the arrest threatened to shoot him, while he was being taken to jail; that he requested, but was denied, the right to see an attorney and members of his family, before the making of the confession; that he had been promised

that it would be "easier" on him if he would admit the offense; that after being returned to the room where the homicide occurred, and before the removal of the body, he was required to get on his knees while the officer prayed; that the officers, or some of them, acted as if they intended to strike him, before he made his confession; that the confession was made sometime before midnight of the day of the homicide, but that he refused to sign it until about 4:45 P. M. the following day. On cross-examination he was asked, and made answers as follows, concerning the confession: "Q. Now, Mr. Bruner you have read this statement, you have seen it and you are familiar with it, that is what you told the police officers the night of May 27th is it not? A. Yes, sir. Q. And everything in that statement is true? A. Yes, sir * * * Q. Were you mistreated in any way while you were there in that office? A. No. Q. Was any threat or promise made to you? A. No, sir."

We think it not necessary to detail the full evidence of the State, either that adduced in chambers or by the State before the jury, as to the facts concerning the contention of defendant. It has been carefully examined, and re-examined, and we are firmly of the view that nothing occurred in the course of the examination or questioning of defendant by the officers which amounted to coercion or duress, or which tendered the confession involuntary or inadmissible in evidence. On the contrary, we believe that defendant was fairly treated by the officers, and his personal and constitutional rights respected and protected. We think the testimony of the State conclusive as to such questions. Even the testimony of defendant to the effect that he refused to sign the confession until several hours after the questioning by the officers had ceased, and his statements quoted above, strongly support the position of the State that the confession was voluntarily made. It was properly admitted as evidence. See *State* v. *Brady,* 104 W. Va. 523, 140 S. E. 546; *State* v. *Richards,* 101 W. Va. 136, 132 S. E. 375.

We have carefully examined the instructions offered by the State and by the defendant, and the several objections

made by defendant to the giving or refusing of the same. The holdings hereinbefore indicated make sufficient answer to any questions raised by such objections. We find no prejudicial error as to the action of the trial court relating to such objections, and the verdict returned was fully supported by the evidence.

The judgment of the Circuit Court of Cabell County and the judgment of the Common Pleas Court of that county are affirmed, and the case is remanded to the Common Pleas Court of Cabell County for such further action therein as may be required by law.

*Affirmed.*