# CHARLESTON.

## CHRISTO DENOFF *v.* SAM FAMA

### (No. 5659)

Submitted October 26, 1926. Decided November 9, 1926

1. APPEAL AND ERROR—TRIAL—*Question of What Witnesses May be Exempted from Separation Order Lies Within Trial Court's Discretion; Except on Clear Showing That Refusal to Exempt Witness from Separation Order Was Arbitrary and Prejudicial to Rights of Complaining party, Trial Court's Action Will Not be Disturbed.*

   The question of what witnesses may be exempted from a separation order lies within the discretion of the trial court, and unless it clearly appears that in refusing to exempt a witness from the provisions of its order the court has acted so arbitrarily and unwarrantedly as to prejudice the rights of a complaining party, the exercise of such discretion by the trial court will not be disturbed on writ of error. (p. 498).

2. SAME—LIBEL AND SLANDER—*Verdict Should Not be Set Aside for Insufficiency of Evidence, Where Sufficiency Thereof Depends on Credibility of Witnesses and Reasonable inferences to be Drawn from Evidence; Evidence Held to*

*Support Judgment Against Unlettered Italian for Libelous Letter Written by Son.*

A verdict of a jury should not be set aside on the ground of insufficient evidence, where the sufficiency depends upon the credibility of witnesses and the reasonable inferences which may be drawn from the evidence. (p. 502).

3. SAME—*Where Evidence is so Conflicting That Appellate Court Cannot Say That Verdict is Plainly and Palpably Unjust, it Will Not be Set Aside as Contrary to Law and Evidence; $1,000 for Libel Charging Section Foreman With Bribing Roadmaster to Make False Report and Using Section Labor to Build House Held Not Excessive.*

Where the evidence on a controlling point in a case is so conflicting that this court would not be justified in saying that the verdict is so plainly against the decided weight and preponderance of conflicting evidence as to make the rendition of the verdict palpably unjust, the verdict will not be set aside as being contrary to the law and the evidence. (p. 503).

Error to Circuit Court, Wyoming County.

Action by Christo Denoff against Sam Fama. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*E. W. Worrell* and *M. P. Howard,* for plaintiff in error.
*Toler & Shannon,* for defendant in error.

LIVELY, JUDGE:

This is an action of libel by Christo Denoff against Sam Fama. The trial court entered judgment on a verdict of $1,000.00 in favor of plaintiff. This writ followed.

Plaintiff has for the last seven years been employed by the Virginian Railway Company as a section foreman, and has for the three years just past been in charge of a section of track of the railway company in Wyoming County. It is his duty to maintain the track in good repair. He has authority to hire men for his section crew, and reports the time worked by each man, and the company pays the crew by check every two weeks. The plaintiff is directly under the supervision of an official called a "roadmaster", who in turn reports to the superintendent of that division.

During the three years just prior to 1925, plaintiff as section foreman has been living and making his headquarters at Milam. Defendant also resides at Milam, where he conducts a hotel, and a retail mercantile business under the name of "Italian Store." Defendant, a native of Italy, cannot write the English language, nor can he speak it very well. His son, Tony Fama, a lad of about twenty years, writes defendant's letters and checks and attends to any other correspondence that may come up in the transaction of his father's business.

The road over which defendant hauls goods to his store from the depot, crosses the railway tracks, the repair and maintenance of which crossing is in charge of plaintiff as section foreman. A controversy arose between plaintiff and defendant as to the necessity of repairing the crossing, and on July 9, 1925, the following letter was sent to J. W. White, Supt. Virginian Railway Company, Princeton, West Virginia:

"Italian Store

Dealers in

GENERAL MERCHANDISE

Shipping Point: Milam, W. Va.

Tipple, W. Va. July 9, 1925.

Dear sir:

In reply to your letter of July 6th 1925 Has your Roadmaster and Trainmaster it was last week *thay* came up to look at the crossing and *thay* come on a *moter* car *witch thay* stop at the crossing and your Roadmaster told your section foreman how it *ort* to been *fixt,* for my son and wife *herd* them say it and when the crossing is *fixt* like the Roadmaster told your section foreman *than* you can call it in good *conditoin.* But your section foreman took the Trainmaster and Roadmaster over to his father in law and there he gave them a treat and he got them to come his way and *thay* wrote to you that the crossing was in good condition for my son *ust* to work on the section and he has heard your section foreman say with two *segars* he could make the

Roadmaster do anything he please *fore* you can't get one out of a *hundered* that say it is a good crossing I would hate to see one in bad condition. Now I want it *fixt* soon, for the winter be coming and I can't get over it. Now by return mail I wan to *no* if you going to have it *fixt* or not for if it not be *fixt* I bring my lawyer over here and *than* I see what to do about it for I broke a pair of wagon *shaves* last week and I can get all witness I want that *no* and say it is the crossing that is no good I would want *fore* you to come and see it than I could explain it a lot better. I got a first class hotel that you can stay all night and it *wont* cost you a thing. Your section foreman *dont* want to *fixt* it but I am going to have a good one before I let it drop for if it was in good condition I would not write to you of it. Now let me *no* at once what you going to do about it. I remain

Your *trully*<br>
ITALIAN STORE By S F

P S over

Your section foreman has built him a house that he got the men that work on the section one or two every day for seven or eight *month* and the *Virginia* pay *fore* that *fore* every pay day they got to the pay office and get *there* check and now he can't *aford* to fix the crossing and it is Virginia *dutie* to keep it in good condition."

The declaration charges that the above quoted letter was written by defendant with the intention of accusing plaintiff of bribing the roadmaster, and procuring him to make a false and improper report; and with the intention of accusing plaintiff of having improperly and fraudulently procured the railway company to pay the expense of constructing his house, by using men from his section to do work on the building. It is charged that as a result of such false accusation, the plaintiff has been injured in his good character and brought into public scandal and disgrace among his neighbors, and particularly the Virginian & Western Railroad Company, his employer, causing its agents and officials to regard the plaintiff with suspicion, and to doubt his honesty and competency, whereby he was dismissed from the company's service.

Issue was joined on defendant's plea of not guilty, and his special plea of justification, and the case was submitted to the jury with the result above detailed.

The first assignment of error relied upon for reversal is, that the court erred in overruling defendant's motion to allow Tony Fama, son of the defendant, to remain in the court room during the trial, to advise with attorney for defendant, because defendant could not speak English, and his attorney could not speak Italian, while Tony could speak and understand both languages.

It is contended that the rights of defendant were prejudiced because he could not advise his counsel during the progress of the case, of things necessary to be brought out in the evidence, and that the court should have permitted the son, who was thoroughly acquainted with the details of the case, to remain in court for the purpose of consulting and advising with counsel during the trial. Counsel contends that when a party cannot speak or understand English, his presence in court amounts to nothing, and he is therefore entitled to have his agent (in this case his son) present.

"In the trial of both civil and criminal causes it is a rule of practice devised for the discovery of truth and the detection and exposure of falsehood, by preventing concert of action among witnesses in a cause, for the presiding judge, on application of either party, or on his motion, to direct that the witnesses shall be examined out of the hearing of each other, or shall be 'Put under the rule', as it is often termed. . . . but according to the general weight of authority a party is not entitled to it as a matter of right, and the granting or refusal of such order is within the discretion of the judge." 21 Ency. of Pleading & Practice, pages 892-3; *State* v. *Morgan,* 35 W. Va. 260; 26 R. C. L. Sec. 65, page 1058; Vol. 1 Thompson on Trials (2nd ed.), Sec. 276, page 284; *State* v. *Hoke,* 76 W. Va. 36; Vol. 1, Greenleaf on Evidence (16th ed.), Sec. 432, page 535. And, "According to numerous decisions, the question what witnesses may be exempted from the operation of the rule when

invoked rests in the discretion of the court, and the exercise
of this' discretion is not reviewable on appeal or error, unless
a clear case of abuse of discretion appears.'' 21 Ency. of
Pleading and Practice, page 985; *State* v. *Hoke*, 76 W. Va.
36.

If it be considered that Toney acted as the agent of his
father in the interviewing of witnesses and looking after
the case generally, there is authority which tends to sup-
port counsel's' contention that Toney should have been per-
mitted to remain in the court room during the trial of the ac-
tion. In *Ryan* v. *Couch*, 66 Ala. 244, the court said, ''Where a
judge is satisfied from the statement of counsel in open court,
or otherwise, that a witness in a cause has acquired such an
intimate knowledge of the facts, by reason of having acted
as the authorized agent of either of the parties', that his ser-
vices are required by counsel in the management of the
trial, he ought not, especially in the necessary absence of
his principal, to be placed under the rule.'' And see also
note on pages 986 and 987 of Vol. 21 Ency. of Pleading and
Practice. It will be noted in passing, that in several of the
civil cases in which a witness was exempted from the rule
because fully conversant with the facts of the case by rea-
son of having acted as the authorized agent of the principal,
the principal was necessarily absent from the trial. But,
''The mere fact of the necessity for the presence of such an
agent will not outweigh the right of the court to exercise its
discretion.'' Vol. 5, Jones Commentaries on Ev., Sec. 807,
page 50. In the case of *Central R. R. Co.* v. *Phillips*, 91 Ga.
526, a boy fourteen years of age sued the railroad company
for injuries sustained in jumping off a train when threat-
ened with lodgment in jail by the conductor. On the trial
of the suit, counsel for defendant requested that the con-
ductor, a witness for defendant, be allowed to remain in the
court room, because he stood in the place of · defendant
in the case, and was the only representative of the railroad
company who was acquainted with the facts as they occur-
red, and counsel desired his assistance in the examination
of witnesses. It was held that it was within the discretion of
the lower court to refuse such request.

Under the facts and circumstances of the instant case, the trial court could well have exempted Toney from its separation order, for according to the statement of counsel, he had acted as his father's agent in working up the case and was more fully conversant with the facts and details thereof, and would have been of more service to counsel in the examination of witnesses than his parent who was handicapped by reason of his lack of readiness in speaking English. But we cannot say that the court has abused its discretion in refusing to grant counsel's request. The matters here involved were not intricate. The issues were clear-cut, the witnesses were few, and the trial was of but brief duration. It is not perceived in what way the defendant was handicapped to his prejudice in making his defense. It is true that he could not speak English very well, but it is likely that he could have secured an interpreter had he so desired. The record shows that there was an interpreter in the court room, who acted as such for defendant when he went upon the stand.

The remaining assignments of error, namely, the introduction of evidence of the alleged libelous letter, the refusal of the court to strike out plaintiff's evidence and direct a verdict for defendant, the refusal of the court to set aside the verdict as contrary to the law and the evidence, and the giving of plaintiff's instruction No. 1, all turn on whether there is sufficient evidence in the case to submit to the jury the question of whether the defendant wrote, or authorized or directed Toney Fama, his son, to write the letter introduced in evidence. This is the controlling question in this case.

According to the plaintiff's evidence, in June, 1925, defendant had complained to him about the condition of the crossing near his store, saying that he was unable to haul his goods over it. The plaintiff told him that the crossing was in good enough shape for the present, but that he would take the matter up with the roadmaster. A short time after this, defendant wrote to the superintendent of the railway company that the crossing needed repair, plaintiff receiving

a copy of this letter through the roadmaster's office. He went to see the defendant and asked him why he had written to the superintendent, in view of their previous conversation, and defendant's reply .was, "There is nothing the matter with the crossing, I am going to try to knock you off the job." A day or so after this, the roadmaster inspected the crossing and decided that it was all right for the present, but that when plaintiff could get the work-train to dump a few cars of dirt near the crossing, he should level it up. The roadmaster went to defendant's house to impart this information, but defendant not being home, he tried to explain the matter to the wife. Plaintiff also told the son of defendant of the roadmaster's visit, and of the intention to level up the crossing when he obtained the necessary amount of dirt. Later, plaintiff received a copy of the letter which furnishes the basis of this' action of libel. The letter was sent to the superintendent of the railroad, and plaintiff received a copy from the roadmaster. The original was later sent from the superintendent's office to Mr. Shannon, attorney for the plaintiff. The letter is not addressed to any person, but it was' agreed upon the record that it was mailed at Tipple, West Virginia, addressed to J. W. White, Superintendent of the Virginian Railway Company, Princeton, W. Va., and was received by Mr. White on July 10, 1925, by mail.

Plaintiff testifies that after he had received a copy of the letter, he went to Princeton to see the original in the superintendent's office, and upon his return he went to defendant and asked him about the letter. They could not understand each other very well, s'o defendant's son Toney acted as interpreter. Plaintiff asked, "What did you report me about the second and third time?" and defendant replied, "I done told you twice I would like to knock you off the job, there is nothing the matter with the crossing. The roadmaster and trainmaster they come examine the crossing and they see the crossing is all right and they talked in your favor and that is the reas'on I write this letter to the superintendent again." Plaintiff further testified that, "He told

me, he says, 'I wrote three times', and after I went to Princeton and I done see the letter, you know, and the clerk read it for me, and I read that myself, too, and I come back and I went to see him again and I says, 'Now, Sam, what makes you report me again', and he said, 'Well, the trainmaster and roadmaster, they come and they talk on your side', and he says, 'That is all I can do, I have to write', and I says, 'That is all right for you to write, I don't blame you if you are going to write to the railroad for something to do to fix the crossing or anything, but what makes you write that and report me I have been stealing some money', and he says, 'Well, I told you the first and second time that crossing is all right, but I would like to knock you off the job.' That is all the evidence I can get from him at the same time."

According to the defendant's evidence, he could not read or write English. He had not told his son Toney to write any letters concerning plaintiff, and he knew nothing about a letter written to J. W. White. Toney had not informed him of writing a letter to the Virginian Railway Company. The crossing was in bad shape, and he had once asked plaintiff to fix it, but he replied he didn't have any time to repair it. Defendant had broken his wagon twice trying to drive over the crossing, but had made no complaint to the railroad. He had never discussed the crossing with any one.

Toney Fama, son of defendant, admitted writing the letter in question, but said that no one had told him to write it. He had tried to get plaintiff to fix the crossing, by talking to plaintiff and sending word to him, but that plaintiff refused, saying to another person on one occasion, within witness's hearing, "Sam Fama, he will die, but he will never see that crossing." The witness then got "mad" and reported plaintiff. He had worked on the section at one time, but plaintiff had cut him off, "for being jealous over some girls, I think." The witness carried on the correspondence of his father in the usual course of business, his parent telling him what to write; but that he (Toney) had written the alleged libelous letter "out of my own head"; that he had written

it "to have him to fill the crossing there that was near
home." He had without his father's knowledge written the
other letters referred to in evidence complaining about the
crossing. The first time his father knew of the letter in-
troduced in evidence was when the suit was brought against
him. On that occasion his father "bawled him out over it".
He didn't know anything about explaining to plaintiff what
his father had said in regard to writing any letters to the
railroad company; that he had never heard his parent say
he had written any letters. Toney said he never discussed
the crossing with his father, nor had his father ever said
anything to him about it.

This was all the evidence relating to the question of
whether the defendant wrote, or authorized or directed his
son Toney to write the alleged libelous letter. We are of
the opinion that the letter was properly introduced in evi-
dence; and that the plaintiff's evidence was sufficient to sub-
mit to the jury the question of defendant's connection with
the writing of the letter; therefore, the trial court was jus-
ified in refusing to strike out plaintiff's evidence and direct
a verdict for defendant. Nor do we think the court erred in
refusing to set aside the verdict as being contrary to the
law and the evidence because the evidence is insufficient to
support a verdict. A verdict of a jury should not be set
aside on the ground of insufficient evidence, where the suf-
ficiency depends upon the credibility of the witnesses, and
the reasonable inferences which may be drawn from the evi-
dence. *State* v. *Jankowski*, 102 W. Va. 234; *State* v. *Winans*,
100 W. Va. 418. It will be observed that the evidence
on the controlling issue in this case is conflicting, and
where this is so, unless this court would be justified in say-
ing that the verdict is so plainly against the decided weight
and preponderance of conflicting evidence as to make the
rendition of the verdict palpably unjust, the verdict will not
be set aside as contrary to the law and the evidence. *Knight*
v. *Coal Co.*, 99 W. Va. 261; *Coalmer* v. *Barrett*, 61 W. Va.
237.

The defendant also assigns as error the excessiveness of
the verdict, contending that as the proof shows that plain-

tiff did not lose his position as a result of the alleged libelous letter, and no evidence being introduced of any special damage, if he is entitled to any damages at all they should be merely nominal. The subject-matter contained in the letter in this case was libel *per se.* "It is a well settled rule of common law that every publication of language which naturally and necessarily tends to injure another in his office, trade or employment is, if without justification, libelous or slanderous as the case may be, and actionable *per se.*" - Vol. 9 Ency. Dig. Va. & W. Va. Reports, page 253. And, "Where words are actionable *per se,* it is not necessary to aver and prove special damages in order to entitle the plaintiff to general damages. The law implies all such damages as are the natural and probable consequence of the words so spoken or written, in all cases where the words are actionable *per se.*" *Milan* v. *Long,* 78 W. Va. 102; Newell on Slander and Libel (4th ed.) Sec. 725; 37 C. J. Sec. 564, p. 115; "Where no evidence is offered as to damages the jury are in no way bound to give nominal damages only; they may read the libel and give such substantial damages as will compensate the plaintiff for such defamation." Newell on Slander & Libel, (4th ed.), Sec. 730, p. 821.

The judgment of the trial court will be affirmed.

*Affirmed.*