# CHARLESTON.

State *v.* Opha Dephenbaugh

(No. 6234)

Submitted October 30, 1928.   Decided November 13, 1928.

*Sidney H. Sommerville* and *William P. Samples,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

Maxwell, Judge:

Opha Dephenbaugh, B. F. Howell, and Flora Chewning were jointly indicted in the circuit court of Taylor county

at the January Term, 1927, for the murder of Sandy Combs, nicknamed Jack Johnson. Dephenbaugh, separately tried, was convicted of murder in the second degree and sentenced to confinement in the penitentiary for twelve years. He prosecutes this writ of error to the judgment of the trial court. The homicide and other occurrences herein recited took place at Wendel, a small mining town in Taylor county.

On the evening of December 24, 1926, Dephenbaugh (hereinafter referred to as the defendant) and Howell were somewhat under the influence of intoxicating liquor. They wanted more and sought it of Charles Caplinger at the home of his father. Charles told them that he could not get it for them but suggested that they might make inquiry of Jack Johnson. This was about eleven o'clock. The men then proceeded with but little delay to the home of Combs. When they arrived at a point on the highway in front of the home of the deceased they were accompanied by Flora Chewning, mother-in-law of defendant. Whether she was with them at the Caplinger home a little while before and accompanied them thence to the home of the deceased or whether she joined them en route is not material. A few minutes after the arrival of these persons at the home of Combs and after he had come out of the house to the road where these people were, a fight ensued in which Combs was mortally wounded by a knife in the hands of defendant. There is a sharp conflict in the testimony as to just what occurred just prior to and at the time of the affray. The widow of the deceased testified that she and the deceased and their eighteen months old child retired about nine o'clock; after they had fallen asleep some one knocked loudly at the kitchen door, and upon her husband's inquiring who was there the reply came that they wanted something; her husband told them "he had nothing for them and to leave there", whereupon they started to swear and call him "all kinds of names"; that her husband then got up and went to the door and again told them he had nothing for them and directed them to leave; that they continued swearing and calling him vile names and asked him to come to the road; that he then shut the door and returned into the room, put on his trousers over his underwear and

went out in his bare feet. While he was thus partially dressing himself she put on her dress and stockings; from the house she watched him as he went to the road and saw the men knock him down; she immediately ran to the road and found her husband down on his back with both of the men on top of him, and the Chewning woman "was stooping over." Referring to the men she said "they was just like they was kneeling with their knees toward his stomach and their hands around his throat;" that she grabbed one of them, later identified as Howell, and pulled him off; defendant then let deceased get up, and "he (meaning deceased) kind of stood up and said 'Buddy, you have got a knife,' and I tried to grab him and he went down over the hill to the porch." He fell on the porch and was unable to get up again. A physician was summoned and the patient removed to a hospital where he died about an hour or two later. The doctor found several severe knife wounds on the body of the injured man; one on the left side of the body between the third and fourth ribs numbering from the top down was two or three inches in length and reached into the chest cavity; there was a deep gash in the biceps muscle of the left arm; one at the back of the neck; another long one but not deep over the lumbar region or small portion of the back. The patient bled very freely. In the opinion of the doctor the chest wound was fatal.

Two boys, Frank Tote and John Kurrucy, 17 and 18 years of age, respectively, testify that just before the fatal affray while they were smoking on the porch of the home of Tote's parents just across the road from the home of deceased they saw defendant and his two companions in the road and heard one of the men tell the other that if he would stick with him they would get somebody; that they (the boys) went back into the house and presently, upon hearing a scream, they ran back to the porch and saw the two men and the woman running down the road.

Defendant testifies that after knocking at the door of deceased and asking for whiskey he was told by deceased that he (defendant) was a damned spy and to get away from there; that as he returned to his two companions at the road,

he said to them (not intending it for the ears of deceased) that "this damned whop won't let me have any whiskey;" that deceased overheard the remark and accused defendant of abusing him, jerking on his trousers, ran out the front way, made for witness, called him a vile name and told him he would kill him. Defendant says he ran and dodged between Howell and the Chewning woman; that deceased caught defendant, threw him down and with one hand on his throat drew out his knife, told defendant he was going to cut his throat, and tried to open his knife with his teeth; that defendant called for help, but not receiving it, and while resisting deceased with his left hand and arm, he got hold of his own knife with his right hand, opened the knife by hooking it on his pocket, and then cut the deceased. He says Mrs. Combs "jumped in about the time I was cutting the man."

B. H. Howell denies that he was on top of deceased as testified by Mrs. Combs, and gives about the same account as defendant. He says he stood in the road talking to the woman while defendant went to the Combs house; that just about the time defendant returned to the road the deceased came out of the house and made for defendant; "he hadn't more than ketched him and downed him I turned and started to walk back to them. Mrs. Chewning was off down the road. She came walking back and came and asked me to part them, about that time Mrs. Combs came up;" that she told witness to go on off and slung him to one side, and she "piled into them and I walked up the road and stayed there;" that he does not know what she did when she reached the struggling men. Witness denies that he as much as touched the deceased; that he did not hear defendant call for help; that Mrs. Chewning told witness to help defendant but he did not do so. Mrs. Chewning's testimony is corroborative of the defendant and Howell.

It is thus to be noted that the evidence of the state and the defense is widely at variance. Back of it all, though, is the bold fact that late at night the deceased while peacefully sleeping with his wife and child was aroused by the defendant and his companions who were not abroad for any good purpose but were on evil bent, and that within a few minutes

thereafter the householder who had been thus disturbed was mortally wounded in a fight that followed this interruption of his night's rest. Improbabilities of the defense testimony must have impressed the jury. It is difficult for reasonable men to believe that while two men were struggling and fighting on the ground the one on top could take a knife from his pocket and open it with his teeth, and that the one underneath could take a knife from his pocket and open it by hooking the handle in the pocket,—catching the blade in his fingers and thus pulling it open; also that the male companion of the man underneath should refrain from rendering the slightest assistance and take absolutely no part in the melee, and that, though requested by their female companion to lend help, he "walked up the road and stayed there." It is also to be noted that although a search was made for the knife which the deceased was charged by the defense to have had at the time of the affray, it could not be found. As an indication of the disposition that was manifested by the defendant and his associates toward the deceased a remark attributed to Howell will be noted. Arthur Hamilton testified that after he had received the alarm he ran out upon the highway and met Howell who inquired where the doctor lived, and on being asked what the trouble was he replied, "only a God damn son of a bitch of a whop down the road all cut to hell."

On the whole evidence we are impressed not only that the jury was warranted in its finding of murder in the second degree, but that it could not with propriety have found otherwise.

It is urged that the court erred in overruling the defendant's challenge of juror C. O. Brown on his *voir dire*. The case had been previously tried and Brown had heard part of the testimony at the trial. He stated, in response to questions of counsel for the defendant, that he had partially made up an opinion but not fully. And then, when asked by the court, if he "could be governed by the evidence and a true verdict render accordingly to this evidence", he replied, "I can." The mere fact of the entertaining of an opinion by a venireman, or even the expression by him of such opinion, with

reference to the guilt or innocence of the accused, does not determine the eligibility of such venireman to serve on the trial. The true test is whether he can render an unbiased verdict on the evidence regardless of the opinion that he may have entertained. *State* v. *Larue,* 98 W. Va. 677, 685; *State* v. *Toney,* 98 W. Va. 236, and cases cited. We think the unequivocal response of Brown to the court's inquiry clearly indicated that he was not disqualified because of opinion to sit as a juror on the trial.

There are certain alleged errors of admission and exclusion of evidence. We find no error in the court's rulings in these matters. For example, counsel for the defendant asked one of the witnesses what he knew about the deceased's ''propensities for fighting''. The court properly sustained an objection to this question. If any inquiry along this line would have been proper, it should have been to the general reputation of the accused as a violent man. 13 R. C. L., 920; *Thurpin* v. *Commonwealth,* 147 Va. 709; 3 L. R. A. (N. S.), note p. 374. A specific inquiry such as here involved does not go to general reputation.

A witness was also asked as to what he knew about the deceased at the time of the occurrence and prior thereto being engaged in the sale of liquor. The court very properly sustained the objection on the ground that such matter was not involved in this issue. There are several other rulings on admission of evidence pointed out as erroneous. It will prolong this opinion too much to recite them, but suffice it to say that a careful examination thereof does not disclose prejudicial error.

Now as to the instructions. A large number of instructions were given for the state as well as for the defendant. State's instructions numbers 6, 15, and 24 are singled out as specially objectionable. Number 6 told the jury that ''malice will be presumed where one without legal excuse so uses a deadly weapon that the death of a human being results therefrom.'' Number 24 was to the effect that insulting and contemptuous words alone are not sufficient provocation, where a deadly weapon is used, to reduce homicide from murder to manslaughter. These instructions appear to be

subject to no more serious vice than that they are abstract, and while abstract instructions should not be given, they seldom form basis for reversal. *Easter* v. *Railway Company,* 76 W. Va. 383; *State* v. *Long,* 88 W. Va. 669; *State* v. *Stafford,* 89 W. Va. 301.

State's instruction number 15 is more serious. It told the jury that if they believed from the evidence beyond a reasonable doubt that the defendant was aroused from his bed in the night time by the defendant and his companions, was called insulting names by them and invited to come to the road, and that they declined to go away on request of deceased, that deceased then had the right to go to the highway and to use such reasonable force as might be necessary to drive the parties away from his premises. We do not approve this instruction as a correct statement of the law. It goes too far. But, finding no other error in the record, we do not reverse the case on the ground of this erroneous instruction, because we find from the whole case that the jury could not properly have found any other verdict. It is settled law that in such circumstances there should not be a reversal. *State* v. *Smith,* 97 W. Va. 313, and cases cited. Even though the deceased may not have had the abstract right to go to the highway to drive away his tormentors as indicated by the instruction, we must not lose sight of the fact that the encounter which followed was precipitated entirely by the defendant and his companions. Disturbers of the peace may not in the night time call a sleeping man from his bed, provoke a fight, kill him without justification, and then rely upon refinements of the law to absolve them from just punishment. "Generally it may be said that any act of the accused in violation of law and reasonably calculated to produce the occasion amounts to bringing on the difficulty and bars his right of self-defense." 13 R. C. L., 832. To the same effect, 30 C. J., 45; 2 Brill, Cyc. Crim. Law, 1196.

"The plea of self-defense is not available to one who used language so opprobrious that a reasonable man would expect it to bring on a physical encounter, and which actually did contribute to bringing it on." *State* v. *Lee,* 85 S. C. 101,

137 Am. St. Rep. 869. See, also, *Moore* v. *People,* 26 Colo. 213; *Lewis* v. *Commonwealth,* 78 Va. 733.

Another point of alleged error was the court's refusal to give defendant's instructions Nos. 21 and 22. These instructions were on the law of retreat. Their substance was included in one or more other instructions given.

Perceiving no prejudicial error we affirm the judgment.

*Affirmed.*