State of West Virginia *v.* T. J. Farley

(No. 9344)

Submitted October 20, 1942. Decided December 15, 1942.

*B. F. Howard,* for plaintiff in error.

*William S. Wysong,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for defendant in error.

Kenna, Judge:

In the unincorporated mining town called Carswell in McDowell County, at about six-thirty in the evening of August 31, 1941, James Adkins was shot through the heart and killed by T. J. Farley, who was thereafter, in the Circuit Court of that county, indicted, convicted and sentenced to be hanged, and this writ of error was granted upon the petition of the accused. The eight separate assignments of error set forth in the petition, in response to the prayer of which this writ was granted, are all included in the five questions submitted and briefed and stated as follows by the plaintiff in error:

"a. The evidence does not warrant a verdict of murder in the first degree.

b. The jury had no right to disregard material testimony of the defendant which is uncontradicted and not inconsistent with other material evidence, physical facts and circumstances.

c. It was error for the court to admit testimony of the witness, Emma Jean Adkins, that defendant had slept in bed with Lorraine Adkins, wife of deceased, because said witness was not properly qualified to testify and said testimony was irrelevant.

d. Instructions Nos. one, two, three, and four offered by the State were erroneously given to the jury by the court.

e. The court erred in refusing to grant defendant a new trial upon the ground that he was not properly represented by counsel in this trial and for the further reason that certain witnesses available were not introduced in his behalf."

It being admitted that the accused caused the death of Adkins by intentionally shooting him with a revolver while both were in the room rented by Farley in the Carswell Clubhouse, the question raised by the first assignment of error concerns whether or not the evidence offered by the State is sufficient to establish deliberation and premeditation, and since the feeling between the two men rested, not upon an immediate occurrence but, upon the reported relationship between the accused and the victim's wife which gave rise, according to Farley's position, to circumstances which justified the killing on the theory of self-defense, we think it is necessary to narrate what we believe to be the material facts.

Both Adkins and Farley were originally from Logan County. Farley had been working in McDowell County about five ·years. The Adkinses moved to McDowell County and came to Carswell while Farley was located there apparently in the early fall of 1940, at first living in a boarding house and later renting a dwelling from the coal company, at whose operation Adkins was

employed, as was Farley. At the time of the killing, Adkins and Farley seem to have been very nearly the same size, being of average height and weight. Two or three months before August 31, 1941, Farley, he says at the suggestion of Adkins who wished to have the purchase of a car financially simplified, rented a room from the Adkinses and took his meals at their home. He and Mrs. Adkins were thereafter seen frequently together in public, and on a few occasions were known to be together alone. A number of witnesses testify to having advised Farley to leave married women alone and to be attentive only to single girls, to statements that Farley made to the effect that he could not help being in love with Mrs. Adkins, and that due to the threat that Adkins had made to take his life, he could kill Adkins and "go free." The two had snapshots made of themselves in very familiar poses.

In the neighborhood of July 21st, according to the testimony of the Adkins girl, a child of eight who slept with her mother, her father returned in the morning after daylight and found Farley with only his night clothes on in bed with Mrs. Adkins and the child. Adkins seemed not to "get mad" and there were no immediate consequences. On another occasion, the child thought she saw Farley kiss her mother. At another time, he was on the day bed in her mother's room.

On July 21st, Farley and Mrs. Adkins were together in a place called "The Grill", which seems to have been in Kimball near Carswell. Adkins found them there, and, according to Farley, backed him against a wall where he threatened to kill him with an open knife. One witness for the defendant testifies that Adkins struck Farley with his clinched fist. According to others, Adkins stated that he ought to kill Farley. Apparently, after the occurrence, they talked together outside The Grill, and seemed to be not in combative moods. However, Farley at that time left the Adkins home, obtaining a room in the clubhouse at Carswell directly across the hall from the head of the stairs leading to the second floor.

There is testimony concerning an altercation Farley had with two men who apparently were in the Adkins home

at around four o'clock in the afternoon of August 31st, and to the fact that Adkins, who was there at the time, ordered them out of the house and went to the house of a neighbor in an attempt to procure a revolver, evidently fearing that he might become involved. His effort was not successful, and around supper time, or between six and seven o'clock, he, Farley and Mrs. Adkins decided to go together to a boarding house in Carswell where they could procure a drink. They were seen together in the car, Adkins under the wheel and Mrs. Adkins sitting between him and Farley, by a witness who had a message for a person whom he asked them about. They went to the boarding house and from there to The Grill, where Adkins undertook to persuade Mrs. Adkins to go home. According to her statement, not wanting to go home and wishing to avoid an argument, she engaged a taxi and drove to Kimball, apparently leaving Farley and Adkins without explaining her purpose. According to Farley's testimony, when Adkins missed his wife he seemed to at once become suspicious that she and Farley planned to meet for the purpose of an illicit tryst. According to Farley, Adkins, for the purpose of preventing their meeting, required him, Farley, to accompany him in searching for Mrs. Adkins. They went to several possible meeting places and ended by going to the clubhouse and to Farley's room, where the shooting took place.

The clubhouse is quite a large frame building with a full front porch reached by six steps and to the left beyond the middle front door is a stairway which turns at right angles from a landing half way up. On the second story are eleven double bed-rooms, Farley's being the second from the front of the house directly across the hallway from the head of the stairs. L. F. Collins was on the front porch of the clubhouse when they got there. Jesse Powell was not there when they arrived, but was on the porch when the shot was fired. Collins says that when Farley and Adkins arrived at the clubhouse they were walking rather "pert", Farley, who spoke, leading Adkins who didn't speak. After they had gone through the screen door and upstairs, within what he estimates to be a minute, he

heard the report of the gun. Powell, who was then on the porch, went to the window and was cautioned by Collins to "watch" because there might be more shooting. Adkins then came onto the porch with his hand to his chest, and upon being asked by Powell what occurred, made a statement that Collins did not understand, but which Powell testified was: "Tom Farley killed me." He then walked to the head of the porch steps, attempted to support himself by putting his arm around the post, failed and fell into the yard where he died immediately, the bullet having pierced the left ventricle of the heart. Collins immediately tried to be of help to Adkins, but seeing that that was impossible, went up and spoke to Farley on the porch with the gun in his hand. Farley asked where Adkins had been hit, and whether the wound was near the heart, and being told that it was, stated that Adkins had been following him all day. Upon being told by Powell not to leave until the "law" came, he told Powell to attend to his own business.

The weapon that Farley had used was a thirty-two caliber Colt revolver belonging to R. A. McConnell, who occupied room twelve, two rooms back and across the hall from Farley's room. When Farley surrendered it, one of its five chambers contained an empty cartridge, the other chambers being loaded, the cap of the cartridge in the chamber immediately preceding the one that had been fired having a deep indentation, indicating that it had been "snapped". That morning, Farley had been in McConnell's room when the maid and her husband were attending to it. He was seen examining McConnell's revolver, and was heard to comment upon what a good weapon it was. He asked them not to tell McConnell that he had examined the gun. The reason for his being in McConnell's room at that time is not explained. It was later in the day that he got McConnell's gun without his permission, carried it to his room and placed it under the pillow on his bed, because, he says, he feared someone would take it. Farley had a small caliber Luger automatic in his dresser.

Farley's account of the actual shooting is that after they had spent some time looking for Mrs. Adkins, Adkins fol-

lowed him to the clubhouse and went upstairs with him. He had told Adkins that he was sick, and that it was his purpose to go to his room and use eye-drops that had been prescribed. When they reached the clubhouse, Farley thought that the best thing for him to do was to go to his room, and since he had the key in his pocket he went ahead of Adkins and "rushed on" opening the door with a bang, so that the door struck the wall and bounced back. He then had his back to Adkins, and as he turned to face him, he saw that Adkins had his hand in his pocket, and Adkins stated: "I am going to kill you, Tom." Farley "grabbed" the McConnell gun and shot once. It is not explained how Farley got the gun from under his pillow in time to shoot first, nor how the cartridge which evidently failed to explode became marked by the plunger. It is quite clearly established that Adkins was not armed.

Of course, it is conceded that in order to justify a verdict of murder in the first degree, the State must be able to show beyond all reasonable doubt that the killing was deliberate and premeditated. The principal contention of the plaintiff in error is that the evidence of the State is insufficient to justify that finding.

In estimating the sufficiency of the State's proof, we believe that it will be rather helpful to bear in mind that certain necessary admissions were unavoidably coupled with the defendant's theory of justification, namely, self-defense. On that theory, the use of the weapon was brought into play after Farley had concluded from the surrounding circumstances that Adkins intended to take his life. He contends that he was able to use his powers of observation, and to determine from appearances that would impress the ordinary man that the use of a deadly weapon was the only reasonable way to avoid great bodily harm at the hands of the deceased. If there was sufficient lapse of time to have permitted Farley to consider the circumstances, and to have reached the conclusion that the use of a gun was necessary, surely the same period of time would have been ample to reach the opposite conclusion and kill unlawfully. Consideration of heat of pas-

sion and other precipitate conduct is not consistent with self-defense.

There can be no doubt but that there was quite a pronounced feeling between the two men. There can be no doubt that the jury was not convinced by Farley's position that as to Adkins that feeling was absolutely groundless. Since conflicting testimony upon appeal is to be looked upon as accepted by the jury on the theory that will sustain the verdict, the numerous witnesses whose statements Farley denied, must be looked upon as having been believed by the jury. Therefore, Farley made the statement that he was in love with Mrs. Adkins, would sooner die than give her up, and that he could kill Adkins and "get out of it". This background conforms to what we believe the jury could have accepted as very clear inferences warranting the belief that Farley had planned what did not look like a sudden killing. He testifies that he had feared a violent attack from Adkins that afternoon while they were searching for Mrs. Adkins. Yet they passed many people on the street, and particularly, Collins and Powell on the clubhouse porch. There was no appeal by Farley nor did he attempt to remain in places where the presence of others would have made a killing extremely unlikely. Instead, he went to the door of his room and unlocked the automatic Yale lock on it, going in ahead of Adkins without attempting to keep Adkins from entering. The only effort to avoid an expected violent assault by Adkins, he says, was made with the pistol of another and without witnesses.

Premeditation is, of course, a difficult mental process to define, but it certainly does not involve as a necessary element a constant purpose for a definite length of time, and unless some mistake has been made in stating its definition so as to wrongfully affect the jury, it is quite clear that their judgment and finding is final. There is highly respected authority, including several West Virginia cases, for the rule that premeditation and deliberation may be inferred from the intentional use of a deadly weapon. Among the cases holding the contrary there are also a number of West Virginia cases, so that the last

enunciation of the rule is to the effect that the circumstances of each particular case govern the propriety of applying it. *State* v. *Bowles,* 117 W. Va. 217, 220, 185 S. E. 205, and cases there cited. See also, *Commonwealth* v. *Chapler,* 228 Pa. 630, 77 A. 1013, 34 L. R. A. (N. S.) 74, 101, and Note to *State* v. *McGuire,* 38 L. R. A. (N. S.) 1054, 1081. However, we do not feel that in this case it is necessary to pass upon the application of that principle, for the reason that here premeditation does not necessarily rest upon the inference to be drawn from the use of a deadly weapon without more. There are many other circumstances from which premeditation could be reasonably deduced.

Based upon the foregoing discussion, we believe that the first assignment of error cannot be maintained.

The second assignment of error deals solely with the testimony of the accused, and takes the position that it should be treated as having definitely established the facts surrounding the killing because uncontradicted, the accused being the only living eye-witness. Due to the fact that we believe its statement is a sufficient refutation of its soundness, we will be content with simply stating that we regard that point as utterly unsound.

Error is assigned to the admission of the testimony of Emma Jean Adkins, the victim's daughter of eight years, used by the State as a witness against the accused to show circumstances indicating the existence of an illicit relationship between Mrs. Adkins and Farley, based upon the witness' alleged incompetence because she did not realize the effect of an oath. In all cases, the competence of witnesses is largely subject to the discretion of the trial judge. See *State* v. *Price,* 96 W. Va. 498, 123 S. E. 283, and cases cited at page 501. Unless that discretion is plainly shown to have been abused, there is no error, but even then the weight to be attached to the testimony is, of course, left to the jury. This child stated that she realized she would go to "the boogerman" if she didn't tell the truth, and on her examination refused several times to respond to questions which she said she did not under-

stand until they were explained. We are of the opinion that no abuse of the trial court's discretion is shown.

The error assigned to the giving of State's instructions numbers one, two, three and four all turn upon the sufficiency of the proof to justify their giving, and therefore, we feel have been sufficiently treated under the first assignment of error. In addition, they were given without objection, and consequently they cannot be considered here. There is an exception to the general rule just stated when the trial court fails to instruct the jury in a murder case that upon returning a verdict of guilty of murder in the first degree, they may further find that the punishment be life imprisonment. That question is not raised in this case, but it has been considered and we have concluded that the instructions given are sufficient.

As to whether or not accused was properly represented by the attorney assigned to defend him by the circuit court, we cannot determine from the record's showing for the obvious reason that we cannot ascertain the underlying circumstances. Whether Farley controlled his defense or followed his assigned attorney's advice we do not know. It may be true, and doubtless is, that witnesses could have been put on the stand in corroboration of Farley's statement that he, Farley, shortly after the time of the assault Adkins made upon him at The Grill, had action taken before a justice of the peace for the purpose of having him, Adkins, put under bond to keep the peace. Whether that showing would have militated for, or would have operated against, Farley, as it might have done on the theory that it was part of a pre-conceived plan to concoct a defense to the actual killing, we think is a matter of doubtful determination. Here we run into the discretion of the trial court in its most challenging form. The reasons underlying that statement are so obvious that we believe their impressiveness lends itself to an understatement. There is no indication that the trial judge failed to properly exercise the high trust reposed in him upon whom rested the constitutional duty of seeing that the accused was adequately defended.

Having found no prejudicial error appearing of record, the judgment of the Circuit Court of McDowell County is affirmed.

*Affirmed.*