STATE OF WEST VIRGINIA

*v.*

CHESTER WILSON

(No. 13240)

Decided July 23, 1974.

Dissenting Opinion August 1, 1974.

*Kenneth H. Fisher* for plaintiff in error.

*Chauncey H. Browning, Jr.,* Attorney General, *Richard E. Hardison,* Deputy Attorney General, *E. Leslie Hoffman, III,* Assistant Attorney General for defendant in error.

BERRY, JUSTICE:

This is an appeal by Chester Wilson, the defendant below and hereinafter referred to as defendant, from a final judgment of the Circuit Court of Wayne County entered February 17, 1972 wherein the court refused to set aside the jury verdict of guilty of voluntary manslaughter. The defendant was sentenced to one to five years in the West Virginia State Penitentiary but was granted a stay of execution pending the outcome of this appeal. The defendant contended that numerous prejudicial errors occurred at his trial and on September 11, 1972 this Court granted defendant's appeal and after two continuances, the case was submitted for decision on May 7, 1974 upon the arguments and briefs on behalf of the respective parties.

The defendant was indicted by the Grand Jury of Wayne County at the July, 1971 term of court for the murder of Arnold Terry Thompson. It appears from the record that the defendant and his brother were involved in an altercation with Thompson's brother approximately a month prior to Thompson's death. Thereafter, Thompson informed several people, including the defendant's wife, that he intended to fight the defendant after which the defendant would require hospitalization. Thompson was physically larger than the defendant and was usually successful whenever he was involved in a fight. As a result of the altercation and subsequent threats from Thompson, the defendant's brother informed the defendant that he had placed a .22 caliber pistol in a truck owned by defendant's brother.

On Saturday, July 3, 1971, the day Thompson was killed, it appears Thompson had been drinking extensively before his death because a blood sample taken from his body by the state police after his death revealed that his

blood alcohol content was .19 of one percent. At approximately 5 o'clock that afternoon Thompson rode his motorcycle past the defendant's house and shortly thereafter came back past the house again. Although the defendant saw Thompson ride by on both occasions, no words were exchanged.

At approximately 5:30 p.m. the defendant borrowed his brother's truck since his car was not in operating condition and drove his wife and two children to the home of his father-in-law, which was located at the end of a narrow, rough dirt road. As the defendant proceeded towards his father-in-law's home he drove past the residence of one Jay Workman. Thompson, who had been dating Patricia Robinson, who was Jay Workman's granddaughter, was talking with Patricia in front of Workman's home when the defendant and his family came by. As the defendant drove by, it appears that Thompson yelled to him to stop and cursed him as the defendant continued down the road to the home of his father-in-law.

After the defendant arrived at his father-in-law's home, he took the pistol from under the seat of the truck and went into the house. The defendant testified that his brother wanted his truck returned so he soon thereafter got back into the truck and proceeded by himself down the road towards the Workman home with the pistol on the seat between his legs. The defendant's wife testified that she begged him not to go back down the road where they had seen Thompson.

In the meantime, the defendant's wife's sister and her husband, Jerry Chafin, and their children, had stopped in the road in front of the Workman home to talk to Thompson as they were proceeding in their car to the home of the defendant's father-in-law. Thompson told Jerry Chafin that he had just had a run in with the defendant and said that he had cursed him but the defendant would not stop. Thompson also stated that he was going to give the defendant an opportunity to use a lead pipe on him as the defendant did on his brother, obviously

referring to the altercation the defendant and defendant's brother had with Thompson's brother about a month prior thereto. Shortly thereafter, the defendant's truck came in sight and Thompson told Jerry Chafin to leave his car in the road and not to move it because the road was too narrow for the defendant to pass by Chafin's car. Chafin stated that he did not want to get involved and attempted to start his car to move it but the car would not start. The defendant stopped his truck approximately two and one-half car lengths from Chafin's car. Thompson started walking briskly toward the defendant's truck and as he approached the truck, the defendant pointed the pistol out of the window of the truck and warned him to stay away or he would shoot. Despite this warning, Thompson continued to approach the truck and the defendant shot once and killed him after he came within three or four feet of the defendant and reached his left arm toward the truck.

The errors assigned by the defendant are as follows: (1) the court erred in refusing to ask the jurors on voir dire examination certain questions requested by the defendant's counsel; (2) the court erred by excluding police officers from the sequestering of the witnesses; (3) the court erred in allowing a ten year old witness for the state to testify before being properly qualified; (4) the court erred in refusing to direct a verdict for the defendant; (5) the court erred in refusing to give to the jury instructions numbered 17 and 47 offered by the defendant.

It is contended by the defendant in support of his first assignment of error that the court should have asked the jury upon request (1) if the jurors had any knowledge of the facts and circumstances involved in the case, from what source this information was obtained, (2) whether the jurors were related to any of the witnesses subpoened by the state, (3) whether the jurors thought it more probable than not that the defendant was guilty because of the indictment returned against him, (4) whether the jurors would give more credibility to the testimony of police officers than to that of any other witness.

After asking certain questions with regard to the qualifications of the jurors on the panel, the court asked the following question of the entire panel:

"Do you know anything about the facts and circumstances of this case, either residing in the community where it occurred; having been talked to by any of the parties or anyone who might be a witness in this case; having seen it or heard it on television; having heard about it on the radio; having read about it in the newspaper, whereby you have formed, made up your mind or expressed an opinion concerning the guilt or innocence of the defendant, Chester Wilson?"

After this question was asked the panel four jurors were subsequently excused because of their knowledge of the case and by virtue of such knowledge it would have been difficult to arrive at a fair and impartial verdict.

After calling four more jurors the court repeated the question asked the panel quoted above and then made the following statement to the jury panel:

"Now, these questions will be addressed to the entire panel. The defendant in this case is Chester Wilson who is sitting here by his counsel Mr. Kenneth Fisher and Mr. Albert W. Jordan, Jr. Do any of you ladies and gentlemen know yourselves to be related by the ties of blood or marriage to Chester Wilson?

"The deceased was Arnold Terry Thompson. Do any of you ladies and gentlemen know yourselves to be related by the ties of blood or marriage to Arnold Terry Thompson in his lifetime?

"Do any of you ladies and gentlemen know any reason why you could not fairly listen to the evidence in this case; listen to the instructions of the Court; listen to the arguments both on behalf of the defendant, Chester Wilson, and on behalf of the State of West Virginia and then when you are sent to your jury room to consider of your verdict, do you know of any reason why, existing in your mind, you could not arrive at a fair and impartial verdict?

> "Now the defendant, as I have stated, is represented by Mr. Albert W. Jordan, Jr., and Mr. Kenneth Fisher. Are any of you ladies and gentlemen at the present time or have you been clients of Mr. Albert W. Jordan, Jr., or Mr. Kenneth Fisher?

> "The State of West Virginia is represented by Mr. William K. Napier, special prosecutor in this case, and by Mr. Robert Chafin, the Prosecuting Attorney of Wayne County. Are any of you ladies and gentlemen clients of or have you been clients of either Mr. William K. Napier or Mr. Robert Chafin?"

The counsel for the defendant then asked the court to interrogate each juror as to what knowledge he had of the facts and circumstances of this case and from what source such knowledge was obtained. The court stated that he would interrogate only one man who responded to that question but not the other nineteen on the panel as there was no response from them. The attorney for the defendant stated that he understood several of the jurors attempted to make a response, but did not, and the trial court then stated:

> "Now, for the purpose of the record, I was facing the panel and one man, the man that I intend to interrogate, is the only man that put up his hand at that time, then the Court instructed him to hold it until he heard the whole question, so I will interrogate the one juror."

The trial court then granted two requests of the defendant's counsel with regard to whether any of the jurors had been complainants or victims in a criminal offense, and whether any of them were friends of the deceased, but refused to ask the four questions set out above.

The general rule with regard to the examination of prospective jurors on voir dire is that a litigant has the right to ascertain the fitness of the prospective jurors called. The statute in this state with regard to the qualifications of jurors and examination on voir dire is Code, 56-6-12, which reads as follows:

> Either party in any action or suit may, and the court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or is related to either party, or has any interest in the ˙ cause, or is sensible of any bias or prejudice therein; and the party objecting to the juror may introduce any other competent evidence in support of the objection; and if it shall appear to the court that such person is not a qualified juror or does not stand indifferent in the cause, another shall be called and placed in his stead for the trial of that cause. And in every case, unless it be otherwise specially provided by law, the plaintiff and defendant may each challenge four jurors peremptorily.

The true test as to whether a juror is qualified to serve on the panel is whether without bias or prejudice he can render a verdict solely on the evidence under the instructions of the court. *State v. Dephenbaugh,* 106 W.Va. 289, 145 S.E. 634; *State v. Flint,* 142 W.Va. 509, 96 S.E.2d 677. The trial court, in the exercise of its sound discretion, may properly limit the extent of the voir dire examination of jurors to inquiries related to their qualifications as provided by the statute. *Carpenter v. Hyman,* 67 W.Va. 4, 66 S.E. 1078. Therefore, the test in considering this assignment of error is whether the court abused its discretion in disallowing the voir dire questions requested by the defendant.

The first request was to ask the jurors if they had any knowledge of the facts and circumstances of the case, from what source this information was obtained. Although this point was adequately covered in the questions propounded to the entire panel by the court, it would have been better practice to grant this request of counsel to remove any suspicion of a biased panel. However, since the court's question covering prior knowledge was specific and the panel apparently cleared of biased jurors, this refusal was not prejudicial error.

The second request, which was refused, as to whether or not any of the jurors were related to any of the witnesses

subpoenaed by the state, might have been proper under certain circumstances to determine "interest in the cause", but no such circumstances appear here. In the absence of a showing that some other relationship would create an "interest in the cause", the statute with regard to the qualifications of the jurors only requires the jurors to be examined as to whether they are related to either party. This was also the requirement at common law. *State v. Dushman,* 79 W.Va. 747, 91 S.E. 809. It has been held that a juror whose brother was a witness as well as the brother's wife and step-daughter did not disqualify the juror as long as he was qualified under the true test. *State v. Dephenbaugh, supra.*

The third request for the court to ask the jury whether it would be more probable than not that the jurors believed the defendant guilty because an indictment had been returned against him was not error for the court to refuse under the circumstances of this case. The court stated that an instruction would be given to that effect, which was done, and any prejudicial error was cured.

The fourth request for the court to ask the jurors whether they would give more credibility to the testimony of police officers than to that of other witnesses was not error to refuse. If such question were to be asked it should contain language such as "more or less inclined to believe the testimony of the police officers than that of other witnesses" and should only be given in such cases where the testimony of the officers constitute practically the entire case for the state or is crucial to the state's case. *Brown v. United States,* 338 F.2d 543; *Sellers v. United States,* 271 F.2d 475. The testimony of the police officers in the case at bar was merely perfunctory. The sheriff testified with regard to the arrest of the defendant and on rebuttal with regard to impeachment of a witness for the defendant and the two state policemen merely testified with regard to the revolver being placed in evidence and the blood tests taken and placed in evidence. It has been held in such cases that it is proper for the court to

refuse to ask the jurors on voir dire whether they would give more credence to a government witness than to a lay witness. *Gorin v. United States,* 313 F.2d 641.

The second assignment that it was error for the court to exclude officers from the sequestration of the witnesses may have been serious if the officers had testified as to material facts relating to the state's case. As has been stated above with regard to the officer's testimony, it was not in any way crucial to the state's evidence. The question as to which witnesses may be exempt from a sequestration order by the court lies within the discretion of the trial court and unless the trial court acts arbitrarily to the prejudice of the rights of the defendant the exercise of such discretion will not be disturbed on appeal. *Denoff v. Fama,* 102 W.Va. 494, 135 S.E. 578.

It was held in point 5 of the syllabus of the case of *State v. Hoke,* 76 W.Va. 36, 84 S.E. 1054 that: "It is within the judicial discretion of the trial court to permit a witness for the state, who is familiar with the facts on which the prosecuting attorney relies to establish the guilt of the accused, to be present in court during the trial to aid him in conducting the examination of other witnesses."

The rule with regard to excluding police officers from a sequestration of witnesses is that it is not error to do so if the testimony of such police officers is not crucial to the state's case and not prejudicial to the defendant. *Yorke v. Commonwealth,* 212 Va. 776, 188 S.E.2d 77; *Near v. Commonwealth,* 202 Va. 20, 116 S.E.2d 85; *United States v. Missler,* 414 F.2d 1293. The sheriff who was allowed to remain in the courtroom by the court was not a witness to the actual shooting of the deceased, although he testified on rebuttal for the purpose of attacking the credibility of the defendant's wife with regard to a statement she made when she testified as a witness on behalf of the defendant. His testimony was not crucial to the state's case. The two state policemen who were allowed by the court to remain in the courtroom were not crucial to the state's case and only perfunctorily testified as to the

identification of the pistol used by the defendant and the blood sample taken of the deceased. Had any of the testimony of these officers been crucial to the state's case it would have been reversible error on the part of the trial court to exclude them from the sequestration of the witnesses. In fact, it would have been better practice to have excluded all but one officer and allow him to assist the state.

It is also the contention of the defendant that the trial court erred in refusing to allow the defendant's wife to testify on surrebuttal. No avowal of what her testimony would be was contained in the record. However, it appears from the rebuttal evidence that she would have testified to the same statement she made on direct examination in an attempt to contradict the sheriff whose testimony merely was to impeach this witness on the statement she made when she testified on behalf of the defendant with regard to threats made by the defendant against the deceased. This witness had been sequestered with the other witnesses at the beginning of the trial, and afterwards returned to the courtroom while the other witnesses were testifying. It was stated in the case of *State v. Stewart,* 63 W.Va. 597, 60 S.E. 591, that where a witness does not withdraw when ordered, or afterwards returns into the courtroom and is present during the examination of other witnesses, it is discretionary with the judge whether or not he will allow the witness to be examined. Then, too, this proposed evidence was merely to impeach an impeaching witness, and if not limited, could continue indefinitely. It would appear that the limitation of such evidence was clearly within the discretion of the trial court. 3A WIGMORE, EVIDENCE § 894 (Chadbourne rev. 1970). Under the circumstances it would appear that no reversible error was committed by the trial court in ruling on this matter.

The third assignment of error that the court erred in failing to qualify Tracy Lee Robinson, a ten year old witness, before allowing him to testify presents a close

question. The general rule is that a witness under the age of fourteen years is presumed not to be competent as a witness, and that such competency must be shown. 2 WIGMORE, EVIDENCE § 508 (3d ed. 1940); *People v. Sims,* 113 Ill. App. 2d 58, 251 N.E.2d 795. When the competency of a witness is raised, it is a question for the court to determine, and not the jury, as to whether the witness is competent to testify. *State v. Cremeans,* 62 W.Va. 134, 57 S.E. 405. However, the entire question of competency is left largely to the discretion of the trial court and its judgment will not be disturbed except in cases of manifest error. The ten year old witness was properly sworn before testifying and his conduct was observed by the court and the court felt, after such observation, that he was competent. The testimony of this witness merely corroborated the testimony of other witnesses, and it would appear that under the circumstances of this case the failure to properly qualify this witness was not reversible error. *Carpenter v. Commonwealth,* 186 Va. 851, 44 S.E.2d 419. It was held in point 2 of the syllabus of the case of *State v. Farley,* 125 W.Va. 266, 23 S.E.2d 616 that: "The competence to testify of a child eight years old is a matter that rests largely in the discretion of the trial court, the exercise of which will not be disturbed unless shown to have been plainly abused." The general rule with regard to the competency of infants under the age of fourteen years is stated in 58 AM. JUR. *Witnesses* § 129, in the following language: "* * * the intelligence, not the age, of a young child is the test of its competency as a witness; that is to say, to be considered competent, a child must be able to receive accurate impressions of the facts to which its testimony relates, and to relate truly the impressions received."

The fourth assignment of error is that the trial court erred in submitting the case to the jury because a prima facie case had not been proved by the state, in other words, it was error for the court not to direct a verdict in favor of the defendant. There is no merit to this contention. There was sufficient evidence introduced during the

trial of this case to warrant the jury's returning a verdict of guilty of first degree or second degree murder in light of the testimony of witnesses concerning statements the defendant made with regard to killing the deceased and the undenied fact that he had a pistol, pointed it at the deceased and fired point blank at him.

The fifth assignment of error that it was error for the trial court to refuse to give to the jury instructions 17 and 47 offered by the defendant is not well taken under the facts and circumstances of this case. Instruction 17 offered by the defendant reads as follows: "The issue in this case is confined solely to the guilt or innocence of Chester Wilson of the offense charged in the indictment; you are in *no way* concerned with the legal or moral propriety or impropriety of anything shown to have been done by the defendant which falls short of proof of the crime charged in the indictment." [Emphasis supplied.] It is true that the ultimate issue before the jury was the guilt or innocence of the defendant of the crime charged in the indictment. However, the defendant's character was placed in issue by the defendant and this instruction would prohibit any consideration by the jury with regard to any evidence of bad character introduced by the state. This instruction would also tell the jury that it was in no way concerned with any other matter which was introduced during the trial of the case which would exclude the altercation between Thompson's brother and the defendant and his brother which was brought out in the examination and cross-examination of the witnesses by both counsel for the state and the defendant's attorney.

Instruction 47 offered by the defendant and refused by the court reads as follows: "The Court instructs the jury that in the consideration of your verdict herein, you shall disregard all and any questions and answers concerning any pipe or beating by pipe which might implicate the defendant, said beating or threats of beating by defendant, if made, are not connected with this case and shall not be discussed or even considered in arriving at your verdict."

This instruction is somewhat similar to instruction 17 offered by the defendant and would prohibit the jury from considering the evidence with regard to the altercation in which the defendant and his brother were involved with the deceased and his brother. There were no prior convictions for other offenses introduced into evidence although such other crimes or offenses if similar in character would have been admissible to show motive or intent. *State v. Hudson,* 128 W.Va. 655, 37 S.E.2d 553. This matter is discussed in point 3 of the syllabus of the *Hudson* case in the following language: "In a criminal case proof of another offense chargeable to the defendant is admissible to show motive or intent, if such other offense is similar and near in point of time to, has some logical connection with, and tends to establish the commission of, the specific offense charged against the defendant, and indicates that such specific offense is part of a system of criminal action." See *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445. The prior difficulties between the defendant and his brother and the deceased and his brother would be proper testimony to be considered in the instant case and would come within the exceptions stated in the *Hudson* and *Thomas* cases. There were no collateral crimes or collateral issues raised in the instant case that would compel the defendant to meet charges not contained in the indictment. These other difficulties between the deceased and the defendant were proper for the jury to consider and were introduced into evidence by the defendant at different times during the trial and the examination of witnesses. Then, too, the jury did not believe the defendant was warranted in relying on the defense of self-defense and it would appear from the entire case that the verdict of the jury was proper under the evidence introduced in the trial of this case. There is no perfect trial and although there may have been error committed during the trial of this case there was no reversible error. *State v. Rush,* 108 W.Va. 254, 150 S.E. 740.

For the reasons enunciated herein, the judgment of the

Circuit Court of Wayne County is affirmed.

*Judgment affirmed.*

NEELY, JUSTICE, dissents:

I respectfully dissent from the majority opinion with regard to the cavalier treatment of the defendant's rights to a meaningful *voir dire* examination. While I should not like to see West Virginia become so concerned with *voir dire* examinations as to assign them the unreasonable importance which they have assumed in some other states; nevertheless, I feel that a criminal defendant is entitled to ask each individual juror any reasonable question under sufficiently impartial circumstances as to elicit a responsive and meaningful answer.

Accordingly, I believe that this case should have begun to develop appropriate detailed standards for *voir dire* examinations in order to establish practical guidelines by which this Court can test the trial courts' discretion.

I further respectfully dissent from the majority's treatment of the effect of numerous errors as being harmless. The correct rule is stated in syllabus point 5 of *State v. Smith,* 156 W.Va. 385, 193 S.E.2d 550 (1972) which says:

> "Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error."

Therefore, I would reverse and remand the case for a new trial.

I am authorized to say that Justice Haden joins with me in this dissent.